**WILLOW TERRACE DEVELOPMENT CO., INC., POST OAK MANOR BUILDING CO., INC., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT**

Docket No. 89852. Filed June 28, 1963.

*Robert H. McCanne* and *W. Carloss Morris, Jr.*, for the petitioners.
*Robert I. White*, for the respondent.

**MULRONEY,** *Judge:* The respondent determined deficiencies in the petitioners' income tax as follows:

| Fiscal year ended April 30— | Deficiency |
| --- | --- |
| 1955 | $9,971.63 |
| 1956 | 99,739.78 |
| 1957 | 114,663.30 |
| 1958 | 33,869.41 |

The issues are (1) whether the cost of water and sewer facilities constructed by petitioners to service their real estate subdivision is includable in the basis of the lots in the subdivision, or, in the alternative, whether the transfer of the water and sewer facilities by Post Oak Manor Building Co., Inc., to the Post Oak Manor Water Co., Inc., constituted a sale in which a loss was incurred by the building company; and (2) whether petitioners may deduct as part of the cost of new houses sold by them certain allowances made for trade-in houses, or, in the alternative, whether the transfer of the trade-in houses to a related corporation was, in effect, a sale of such houses in which the petitioners incurred a loss.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Willow Terrace Development Co., Inc. (hereinafter called Development Co.), a Texas corporation, was organized on May 5, 1954. The outstanding stock of the corporation was held as follows from the date of incorporation until May 8, 1958:

| Name of owner | Percentage of outstanding stock |
|---|---|
| Latimer Murfee | 52 |
| Dan McCrary | 8 |
| W. W. McMillan | 40 |

Post Oak Manor Building Co., Inc. (hereinafter called Building Co.), a Texas corporation, was organized on June 8, 1954. At all times here relevant all of the outstanding stock of the corporation was owned by Development Co.

A consolidated corporate income tax return was filed by Development Co. and Building Co. for each of the fiscal years ended April 30, 1955, 1956, 1957, and 1958, with the district director of internal revenue at Austin, Tex. Development Co. and Building Co. will sometimes hereinafter be called petitioners.

Post Oak Manor Water Co., Inc. (hereinafter called Water Co.), a Texas corporation, was organized on June 7, 1954. Terwil Corp., a Texas corporation, was organized on July 18, 1955. The outstanding stock of both Water Co. and Terwil Corp. was held, from the dates of incorporation until May 8, 1958, as follows:

| Name of owner | Percentage of outstanding stock |
|---|---|
| Latimer Murfee | 52 |
| Dan McCrary | 8 |
| W. W. McMillan | 40 |

W. W. McMillan, for several years prior to 1950, had been in the business of subdividing real estate and constructing properties (principally residences) to sell, mostly in the vicinity of Houston, Tex.

During the early 1950's he continued in said business and was also in the poultry business in Houston, Tex. McMillan was president of Development Co., Building Co., Water Co., and Terwil Corp. during the fiscal years here relevant.

Latimer Murfee was an attorney in Houston, Tex., during the period here relevant. Dan McCrary, for about 8 years prior to 1954, was an officer of a real estate mortgage and financing company that operated in Texas and Louisiana.

On June 17, 1954, Development Co. purchased 130.648 acres of land located approximately 2 miles south of the city limits of Houston as they existed during June 1954. On the same date the Development Co. conveyed the tract of land to Building Co. subject to certain outstanding indebtedness, in the total amount of $391,944.

Building Co. subdivided part of the 130.648-acre tract of land into 432 lots and designated streets and easements for water and sewer lines for public use in the subdivision. The subdivision was known as Post Oak Manor and was platted in five separate parcels, as follows:

| Plat filed | Parcel No. | Acreage | Number of lots |
|---|---|---|---|
| July 21, 1954 | 1 | 16.96 | 60 |
| June 6, 1955 | 2 | 21.14 | 86 |
| May 30, 1955 | 3 | 20.73 | 92 |
| Jan. 5, 1956 | 4 | 21.81 | 104 |
| Aug. 30, 1956 | 5 | 19.86 | 90 |
| Total | | 100.50 | 432 |

All houses in Post Oak Manor were constructed and sold by Building Co. and the construction was in accordance with Federal Housing Administration specifications and requirements so that the FHA would issue commitments for loan insurance guarantees enabling Building Co. to sell the houses with mortgages under guarantees by the FHA or the Veterans' Administration.

The FHA, as a condition for issuing loan commitments on the subdivision, required that a satisfactory water system, sewerage system, and garbage pickup service be made available to the houses in the subdivision. In all subdivision developments constructed after 1950 in which community water or sewer systems were to be utilized the FHA required the use of the trust deed procedure. The FHA required that the private owner of the systems convey title to the site and the plant improvements as well as the utility lines in the streets and/or easements to an approved trustee even though the private owner continued the active management and control of the system. If the private owner abandoned the plant, changed the rate structure materially, or failed to provide satisfactory service, the trustee was given the right in the trust deed to take over the operation of the system for the prop-

erty owners, and in that event the private owner of the system had no further right, title, or interest in the system. FHA prescribed the content of the forms to be used in this trust deed procedure.

After Building Co. found it would be unable to obtain water and sewerage services from the city of Houston, and after determining it would be more economical to build its own systems rather than obtain the services from a neighboring subdivision developer, Building Co. constructed a water well, a water pumping plant, and a sewage disposal plant on sites located within the 130.648-acre tract for the use of all the Post Oak Manor subdivision. The water system designed for Post Oak Manor followed the design generally used by the city of Houston. The cost to Building Co. of these systems was as follows:

| Section | Date completed | Portion completed | Number of connections | Cost |
|---|---|---|---|---|
| 1 | Feb. 8, 1955 | Water well and plant, and sewage treatment plant. | | $48,885.31 |
| 1 | Feb. 8, 1955 | Water distribution system and sanitary sewer system. | 60 | 28,293.75 |
| 2 | June 16, 1955 | Water distribution system and sanitary sewer system. | 86 | 28,765.31 |
| 3 | June 1, 1955 | ____do____ | 92 | 19,962.81 |
| 4 | Feb. 20, 1956 | ____do____ | 104 | 16,661.87 |
| 5 | Oct. 5, 1956 | Water distribution system | 90 | 14,618.44 |
| | | Total | 432 | 157,187.49 |

Under an instrument executed July 30, 1954 (but filed several months later with the recorder of deeds), Building Co. conveyed to Water Co. two tracts of land located within the 130.648-acre tract identified as the waterplant site and the sewage disposal plant site "together with all water distribution lines and all sewage collection lines now constructed or installed or hereafter constructed or installed in said Post Oak Manor." On the same date Building Co. and Water Co. executed an agreement which contained, in general, the following provisions: (1) Water Co. agreed to furnish to all householders in Post Oak Manor, upon adequate distribution and collection systems being installed and turned over to Water Co., water, sewerage, and garbage pickup services under the terms and conditions therein provided; (2) each householder was required to purchase his own watermeter at a charge not to exceed $22; (3) for each water connection and sewer connection made Water Co. would charge Building Co. a $50 top charge which no householder would be required to pay; (4) the exact rates to be charged by Water Co. to each householder for water services; (5) the monthly flat rates to be charged by Water Co. to each householder for sewage disposal and garbage pickup to be furnished by Water Co.; (6) each householder would deposit with Water Co. a deposit of $6 as a guaranty for payment of monthly charges; (7) the various rates provided for in the agreement "shall

not be increased in the absence of changed conditions, such as general increase in costs of materials or supplies or labor, or unanticipated conditions with respect to the water-bearing strata, or of other adverse conditions beyond the control of the WATER Co. adversely affecting the supply of water to its well or wells, or in the absence of other changed conditions making such raise in the rates charged reasonably necessary; and such rates may be raised only if and when they shall prove insufficient to bear normal cost of operation, provide sufficient reserves for replacement, depreciation, and obsolescence, and provide a reasonable rate of return on the basis of capital investment"; (8) the contract would remain in force for 50 years; (9) Water Co. agreed to operate the water and sewer plants, providing water and sewer services to the householders, for a period of 50 years or until such time prior to the expiration of 50 years as the services rendered by Water Co. were assumed by some municipality or improvement district at a consideration satisfactory to Water Co.; (10) Water Co. agreed to comply with the terms of "a certain Water Trust Deed and a certain Sewer Trust Deed of even date herewith relating to Post Oak Manor, Section One, both executed by and between WATER Co., and REALTY MORTGAGE COMPANY, INC., as Trustee"; and (11) Building Co. granted to Water Co. the necessary easements and rights-of-way in the subdivision to provide the water, sewer, and garbage pickup services to householders in said subdivision.

Under date of July 30, 1954 (but filed several months later with the recorder of deeds), Water Co. executed a water trust deed and a sewer trust deed in favor of Realty Mortgage Co., Inc., Trustee. The sewer trust deed provided, in part, as follows:

THAT WHEREAS, Grantor [Water Co.] is the owner of certain property in and next to POST OAK MANOR, SECTION ONE, a Subdivision in Harris County, Texas (according to the plat thereof appearing in the office of the County Clerk of said County under File No. 1289569, upon which there is located a sewerage system including a sewage collection system and appurtenances together with a sewage treatment plant, for the purpose of supplying sewage disposal service to the dwellings located in said Subdivision; and

WHEREAS, it is the intention and purpose of the Grantor that such sewerage system shall be used and operated to provide adequate disposal of sewage for each of the dwellings located in said subdivision, regardless of the ownership of the individual properties and to properly maintain the sewerage system so that it will not adversely affect the properties located in such subdivision and to assure the continuance of the operation and maintenance of such sewerage system for the benefit of the present and future owners of the individual properties, the mortgagees holding mortgages covering such property and the Federal Housing Administration:

NOW, THEREFORE, for and in consideration of the undertakings of the Grantor to provide and assure the maintenance and operation of the sewerage

system as aforesaid * * * the Grantor does hereby grant and convey to [Realty Mortgage Company, Inc.] as Trustee, the following property, to wit:

(A) [The sewage disposal plant site.]

(B) [The sewage collection system, as described.]

This conveyance is upon the trusts and for the purposes following, to-wit:

1. This grant is for the benefit of the present and future owners of all and each of the houses in the Subdivision, as well as the holders of the mortgages covering each of the dwellings and insured by the Federal Housing Administration, and Trustee shall hold the title to the property granted by this indenture until either (a) the sewage collection system and sewage treatment plant connected therewith are taken over by a Governmental authority for maintenance and operation, or (b) other adequate sewage disposal service is provided by a Governmental authority through means other than the operation of sewerage system and facilities now transferred to the Trustee herein, and upon the happening of either of these conditions this indenture shall be of no further effect and Trustee shall thereupon immediately reconvey the property to the Grantor, its successors or assigns.

2. [Grantor agrees to provide for the dwellings in the subdivision all necessary sewage services and agrees to operate the system in accordance with certain standards.]

3. [Grantor agrees to maintain the sewerage system in good order and repair.]

4. Should Grantor fail to operate and manage the sewerage system, in the manner and under the conditions specified in paragraphs numbered 2 and 3 above until the happening of one of the events set forth under (a) and (b) of paragraph numbered 1 above, or collects or attempts to collect from the customers a charge in excess of the rates specified in paragraph 6 herein, whichever of such events shall first occur, then Trustee shall have the right to immediate possession of the sewerage system for the purpose of operating and maintaining the same, and the right to hold, use, operate, manage, and control the same either itself or by or through any of the agencies or parties for whose benefit this trust is created and it may take possession thereof for the purpose of operating the same, and in that event, the Trustee or the entity operating the sewerage system in its behalf or in the behalf of any of the beneficiaries of this trust, shall be subrogated to all rights of the Grantor to levy and collect a charge against each customer at rates not in excess of those specified in paragraph numbered 6 herein.

5. Prior to the happening of any of the events, numerated as (a) and (b) in paragraph 1 above, the Grantor shall not transfer the system or property to any person, firm or corporation whatsoever, except a Governmental authority which is empowered to take over the sewerage system and operate it, and the Trustee shall have no power to execute a conveyance for the system and property except to Grantor under the provisions of paragraph numbered 1, or to such Governmental authority.

6. The Grantor reserves the right to levy and collect a charge for sewerage services provided to the occupants of each of the properties in the Subdivision in the amount of $1.50 per month. Service shall be charged on a prorata basis from the date the service is established at the request of the customer to the date of its discontinuance.

7. If it should become necessary at any future time for the Trustee or any entity acting in its behalf or any beneficiary under this trust indenture, to take over, operate and manage the sewerage system under the provisions of this trust, then and in that event, the operator of such system shall be entitled to a Trustee's fee payable from the income of the water system at a rate not in excess of 5% of the gross charges collected by such Trustee, provided that

such Trustee's fee may be increased with the approval of seventy-five (75) per cent of the owners of the property in the said Subdivision.

The water trust deed, also covering section one of the subdivision, contained provisions which were substantially similar to those in the sewer trust deed and served the same purpose. Both deeds were duly recorded.

On June 20, 1955, Water Co. executed a water trust deed and a sewer trust deed with respect to the water and sewerage systems in sections 2 and 3 of Post Oak Manor. The deeds were substantially similar to the deeds executed on June 30, 1954, and they were duly recorded. On March 2, 1956, Water Co. executed a water trust deed and a sewer trust deed with respect to the water and sewerage systems in section 4 of Post Oak Manor, and the deeds were substantially similar to the prior deeds. Neither of the March 2, 1956, deeds was recorded.

All six deeds were executed by Water Co. on the forms furnished by the FHA, and other than these six deeds, no other water or sewer trust deeds were executed in connection with the Post Oak Manor subdivision.

All water distribution lines, waterlines, sewer collection lines, sewerlines, and any other connection or appurtenance to the water and sewer system in the Post Oak Manor subdivision, sections 1 through 5, were placed in appropriate utility easements or in street easements which were dedicated to the public use.

When the utility facilities were conveyed by Building Co. to Water Co. they were given a zero basis by Water Co., and no depreciation, obsolescence, or replacement costs or expenses were ever claimed on these facilities by Water Co. for Federal income tax purposes. No salary was paid to McMillan, who was president of Water Co., during the years here relevant. Water Co. showed the following net income (or loss) in the fiscal years ended May 31, 1955 through 1959:

| | Fiscal year ended May 31— | | | | |
| | 1955 | 1956 | 1957 | 1958 | 1959 |
|---|---|---|---|---|---|
| Total income | | $421.80 | $23,523.81 | $29,869.75 | $31,914.74 |
| Total expenses | $216.45 | 3,299.40 | 10,826.61 | 27,583.35 | 30,870.27 |
| Net income | (216.45) | (2,877.60) | 12,697.20 | ¹ 2,286.40 | 1,044.47 |

¹ In addition, Water Co. realized a net short-term capital gain of $3,259.99 from the sale of acreage sold for $200,000.

During the 4 fiscal years here involved Building Co. sold new houses in Post Oak Manor subdivision, and in many instances a prospective purchaser already owned a residence. Building Co. agreed in many instances, after September 1, 1955, to accept the prospective purchasers' interests in their old homes in satisfaction of a

part of the stated sales price of the new houses in Post Oak Manor. Building Co. gave purchasers of new houses credit on the stated purchase price of the new house and treated this credit as a part of the downpayment. All of the trade-in houses were encumbered by outstanding mortgages and obligations, and Building Co. (or Terwil Corp.) acquired ownership of such trade-in houses subject to the prior encumbrances.

The allowances made for trade-in houses were handled by McMillan, who made the allowances without inspecting the old houses. No appraisals were made of the trade-in houses before the new houses were sold.

Building Co. made trade-in allowances upon sales of new houses in Post Oak Manor subdivision as follows:

| For year ending— | Number of houses | Amount |
|---|---|---|
| Apr. 30, 1956 | 53 | $117,153.51 |
| Apr. 30, 1957 | 77 | 176,606.22 |
| Apr. 30, 1958 | 21 | 54,850.00 |
| Total | 151 | 348,609.73 |

The outstanding encumbrances on the trade-in houses on the various dates that they were acquired totaled approximately $1,115,700.

After completing the transactions with purchasers in which trade-in houses were involved, Building Co. caused the new house purchasers to immediately execute deeds to the trade-in houses to Terwil Corp., subject to existing encumbrances. At no time did Terwil Corp. assume an indebtedness owed on any of the trade-in houses. The only bookkeeping entries made by Building Co. with respect to trade-in houses was to debit an account called trade-in allowances for the amounts allowed for equities and to write off, or credit, the trade-in allowances account at the end of the fiscal year. Neither the total value of the trade-in houses nor the amount of the encumbrances thereon ever appeared on the books of the Building Co. It is stipulated that the "Equities in 'trade-in houses' were given a zero basis for income tax purposes by Terwil Corporation."

Terwil Corp. made no attempt to repair the trade-in houses. Immediately after receiving a trade-in house, Terwil attempted to sell it at the best possible price. No attempt was made by Terwil Corp. to obtain credit reports on prospective purchasers. Terwil Corp. sold all of the trade-in houses under contracts which provided for an initial downpayment, generally in the amount of $200, with the balance of the purchase price payable over a period of years. Terwil Corp. was generally able to sell the trade-in houses without any excessive delay. At least 50 of the houses were subsequently repossessed by Terwil Corp. and resold, and some of these were repossessed a third time and

sold a third time. There was no established market in Houston during the years here involved for the contracts utilized by Terwil Corp. in selling the trade-in houses. Terwil Corp.'s only business was dealing in trade-in houses deeded to it by purchasers of new houses from Building Co.

The total selling price of 150 of the trade-in houses first sold by Terwil Corp. was approximately $1,503,500. (Data on one of the trade-in houses is not available.) The total downpayments, encumbrances assumed by purchasers of the trade-in houses, and balances due under the contracts under which the trade-in houses were sold were approximately as follows:

| | |
|---|---|
| Total downpayments (151 houses) | $34, 200 |
| Encumbrances assumed by purchasers (150 houses) | 1, 110, 900 |
| Balance due under the contracts (150 houses) | [1] 358, 600 |

[1] This amount represents the difference between the encumbrances assumed, together with the downpayments, and the total sales price of the trade-in houses.

McMillan, who was president of Terwil Corp., was paid no salary. The net income of Terwil Corp. was as follows:

| *Fiscal year ending April 30* | *Net income* |
|---|---|
| July 18, 1955–Apr. 30, 1956 | $9,411.53 |
| 1957 | 20,108.07 |
| 1958 | 6,362.72 |
| 1959 | [1] 19,027.15 |
| 1960 | 8,004.00 |
| 1961 | 35.00 |

[1] Includes loss of $748.66 on sale of auto.

On May 8, 1958, Murfee and McCrary sold their interest in Terwil Corp. (60 percent of the outstanding stock) and their interest in Water Co. (60 percent of the outstanding stock) to Water Co. These purchases were part of a transaction whereby Water Co. purchased the interests of Murfee and McCrary in several companies (including Water Co. and Terwil Corp.) for $150,000. Out of this total, $4,800 was allocated and paid for the stock in Terwil Corp. and $27,000 was allocated and paid for the stock in Water Co.

Building Co. sold all of the 432 lots and improvements thereon in sections 1 through 5 of the Post Oak Manor subdivision. On May 14, 1958, Building Co. sold 21.12 acres of its original 130.648-acre tract to B. H. Howton, who had no interest in any of the corporations here involved and was not related to any of the individuals here involved. Howton subdivided the 21.12-acre tract and dedicated streets and utility easements to the public use and designated the area as section 6 of Post Oak Manor subdivision. To obtain water and sewerage facilities for the houses to be constructed on the 89 lots in section 6, Howton entered into a contract with Water Co. whereby Howton would construct sewerage collection and water distribution

systems for the section and link them to water and sewer mains built by Building Co. in the first five sections of the subdivision and whereby Howton would be reimbursed for any amount that might be paid by and governmental authority to Water Co. for said systems.

In 1950 the city of Houston annexed certain contiguous areas and from 1950 through 1955 made 47 purchases of water and sewerage systems from private companies in the annexed areas. Subsequent to 1953 several subdivisions, in addition to Post Oak Manor, were developed in the area south of the city limits of Houston. On December 31, 1956, the city of Houston enacted ordinance No. 3351 which annexed an area that included Post Oak Manor subdivision. Action by the city of Houston to annex this area was begun at least by February 1, 1956. Ordnance No. 3351 was unsuccessfully contested by one E. E. Forbes in the State courts. (*Forbes* v. *City of Houston*, 304 S.W. 2d 542 (July 11, 1957), rehearing denied (Aug. 12, 1957)). The Supreme Court of the United States denied certiorari in the proceeding on June 9, 1958.

Pursuant to the requirements of two ordinances enacted by the city of Houston early in 1957, Water Co. advised the city council of Houston in a letter dated February 15, 1957, that the total replacement cost of the Water Co.'s water system was $207,237.77 and the total replacement cost of the sewer system was $94,102.49. On May 1, 1957, the city of Houston enacted an ordinance prohibiting supplies of water and sewerage services in the area annexed December 31, 1956, from charging higher rates than those in effect on the annexation date until future rate hearings. Water Co. did not obtain any rate increase from the city of Houston either in 1957 or 1958. On August 19, 1958, Water Co. offered to sell its water and sewer systems to the city of Houston for a total price of $264,185.17.

In September 1959 the city council of Houston adopted a motion to purchase the facilities and assets of Water Co. in the Post Oak Manor subdivision, sections 1 through 5, for the amount of $215,000, and at the same time the city council adopted a motion to purchase the facilities installed in Post Oak Manor, section 6, for $6,200. By October 20, 1959, the city of Houston had passed ordinances under which $221,200 was appropriated to purchase the water and sewer systems in Post Oak Manor, sections 1 through 5, and the water and sewer facilities in section 6.

Employees Poultry & Egg Co., Inc., was a Texas corporation organized in March 1953 and controlled by McMillan. On September 4, 1959, the name of the corporation was changed to Southwest Side Utility Co. (hereinafter called Southwest) and the charter was also amended to enlarge the corporate purposes. On October 5, 1959, Southwest acquired all of the outstanding stock of Water Co. from McMillan, and on December 3, 1959, Southwest acquired the interest of Water Co.

in the sewerage and water facilities and systems serving all six sections of Post Oak Manor subdivision, subject to the contract with respect to section 6. On December 3, 1959, and December 9, 1959, Southwest conveyed to the city of Houston the Post Oak Manor waterplant and site, the Post Oak Manor sewage treatment plant and site, the water distribution system in sections 1 through 6 in Post Oak Manor, and the sewer system in sections 1 through 5 of Post Oak Manor for a total consideration of $221,200. On December 11, 1959, Realty Mortgage Co., Inc., Trustee, executed two quitclaim deeds and conveyed to the city of Houston its title and interest in the Post Oak Manor waterplant and site, sewage treatment plant and site, and the water and sewer systems. During December 1959 the city of Houston paid to Southwest the full purchase price of $221,200. Of this amount $6,200 was paid to Howton with respect to facilities in section 6. No part of the balance of the purchase price, $215,000, was paid to purchasers of new houses in Post Oak Manor subdivision.

There were approximately 60 privately owned water and sewerage systems in the area annexed by the city of Houston in 1956, and by November 1962 the city had acquired about 40 of these systems.

The total cost of construction to Building Co. of the water and sewerage facilities, in the amount of $157,187.49, was prorated over the 432 lots in Post Oak Manor, sections 1 through 5, and the following deductions attributable to the prorated cost of such facilities were claimed on the consolidated returns for the fiscal years here involved:

| Fiscal year ending April 30— | Lots sold | Deduction |
|---|---|---|
| 1955 | 51 | $18,465.99 |
| 1956 | 186 | 67,558.50 |
| 1957 | 158 | 57,649.92 |
| 1958 | 37 | 13,513.08 |
| Total | 432 | 157,187.49 |

Respondent determined that no portion of the cost of the water and sewerage systems could be added to the cost of the lots and disallowed the deductions in full.

On the consolidated income tax returns filed by Development Co. and Building Co. for the fiscal years ending April 30, 1956 through 1958, Building Co. deducted as a cost or expense the trade-in allowances granted to purchasers of new houses for their old houses as follows:

| Fiscal year ending April 30— | Amount deducted |
|---|---|
| 1956 | [1] $133,720.21 |
| 1957 | [1] 154,689.52 |
| 1958 | [1] 60,200.00 |

[1] It has been stipulated, however, that the actual trade-in allowances for these fiscal years were $117,153.51, $176,606.22, and $54.850, respectively.

Respondent determined that the trade-in allowances did not represent "a reduction of the sales price of new houses, * * * a cost of houses sold, or * * * an expense or loss" and disallowed the deductions in full.

OPINION

The first issue is whether Building Co. may include the cost of the water and sewerage systems in the basis of the 432 improved lots sold by it in the fiscal years before us. Petitioners rely principally upon *Estate of M. A. Collins*, 31 T.C. 238, and *Country Club Estates, Inc.*, 22 T.C. 1283, while respondent contends that this case is controlled by *Colony, Inc.*, 26 T.C. 30, affd. 244 F. 2d 75, reversed on another issue 357 U.S. 28, and *Biscayne Bay Islands Co.*, 23 B.T.A. 731.

In *Estate of M. A. Collins, supra*, the taxpayers were engaged in the business of buying undeveloped real estate, subdividing it, and selling the lots to builders. The FHA and the Veterans' Administration would approve mortgage insurance only on subdivision lots having some adequate sewage disposal service, and in the absence of septic tanks or a governmentally operated sewage disposal system, the Federal agencies required that a sewage disposal system be built to service a subdivision. In addition, the FHA required that legal title to the sewage disposal system be held by a corporation and that the system be transferred to a trustee for the benefit of the owner of the lots in the subdivision and the holders of the mortgages thereon. To meet these requirements, taxpayers organized a corporation and caused a sewage disposal plant and connecting lines to be constructed, with legal title in the corporation; the corporation then executed a trust deed to one of the taxpayers, as trustee, conveying to him the interest of the company in the sewage system.

This Court stated the applicable principle in these fact situations to be as follows:

A careful consideration of the cases above cited [*Country Club Estates, Inc.*, 22 T.C. 1283, and *Colony, Inc.*, 26 T.C. 30] indicates that if a person engaged in the business of developing and exploiting a real estate subdivision constructs a facility thereon for the basic purpose of inducing people to buy lots therein, the cost of such construction is properly a part of the cost basis of the lots, even though the subdivider retains tenuous rights without practical value to the facility constructed (such as a contingent reversion), but if the subdivider retains "full ownership and control" of the facility and does "not part with the property * * * for the benefit of the subdivision lots," then the cost of such facility is not properly a part of the cost basis of the lots.

We found in the *Collins* case that the taxpayers conveyed "substantial beneficial property rights" in the sewage disposal system to the owners of lots in the subdivision, retaining to their wholly owned corporation "the unprofitable right (and duty) to operate the system for the benefit of the owners of the lots," and also retaining a reversionary

interest contingent upon a remote possibility. Under those facts, we held that the "inclusion of the cost of the sewage system in the basis of the lots would better and more fairly reflect the true income received by petitioners during the taxable year."

It is our conclusion that the instant case is controlled by our holding in *Estate of M. A. Collins, supra.* The record here makes it abundantly clear that the water and sewage systems were constructed for the basic purpose of inducing and making possible the sale of improved lots in the Post Oak Manor subdivision. The steps taken by Building Co. to meet the FHA and Veterans' Administration requirements parallel those taken in the *Collins case.* A comparison of the trust deed executed in the instant case with that in the *Collins* case reveals a striking similarity in the stated purposes to benefit owners of the lots in the respective real estate subdivisions and in the explicit restrictions (including rate limitations) placed upon the operator of the utility systems.

Respondent seeks to distinguish the *Collins* case by arguing that the developers of Post Oak Manor intended to make a profit from the operations of the Water Co. and actually operated at a profit for several years.[1] We cannot agree with respondent's argument. As we read the *Collins* case, the pivotal consideration is whether the basic purpose for constructing such utilities systems in real estate subdivisions is to induce people to buy lots in such subdivisions. It is a question of fact, and in resolving it the profit and loss record of the operating company must, of course, be considered. But this does not mean that the presence of some profit will always be fatal to the taxpayers's case. In fact, the returns of the operating company in the *Collins* case showed a total net loss of $97.09 in the first 2 years of its operations (fiscal years 1951 and 1952), and after the operating company in fiscal year 1953 acquired the sewerage system of an adjoining subdivision, the returns of the company showed net income of $82.93 and $1,975.90 in fiscal years 1953 and 1955, and net losses of $1,449.97 and $3,402.40 in fiscal years 1954 and 1956. Yet this Court concluded that the taxpayers constructed the sewerage system "not only for the basic purpose but for the sole purpose of inducing and making possible the sale of lots in the * * * subdivisions."

Nor does the fact that the water and sewerage systems servicing the first five sections of Post Oak Manor subdivision were sold to the city of Houston in December 1959 for $215,000 call for any different result.

---

[a] Water Co. showed net losses of $216.45 and $2,877.60 in the fiscal years ended May 31, 1955 and 1956, and net income of $12,697.20, $2,286.40 (unadjusted for gain on sale of acreage), and $1,044.47 in the fiscal years 1957 through 1959. But it also appears that no salary was paid to McMillan, the president of Water Co., during these years, and furthermore, no depreciation, obsolescence, or replacement costs were considered in determining these net profit figures.

The developers in the *Collins* case were similarly able under the trust deed to sell the sewerage system constructed by them to a governmental authority which would take over the plant and operate it.

We conclude that the basic purpose of Building Co. in constructing the water and sewerage systems was to induce and make possible the sale of new houses in the Post Oak Manor subdivision, and we hold that the cost of such systems was properly included in the basis of the new houses sold in the years before us.

The next issue is whether the Building Co. was correct in deducting the trade-in allowances for old houses as a cost or expense in the sale of new houses from the subdivision. It is stipulated that when selling the new houses, "Building Co. agreed in many instances, * * * to accept the prospective purchasers' interests in their respective homes in satisfaction of a part of the stated sales price." Building Co. caused the purchasers to deed their trade-in houses to Terwil Corp., which immediately tried to sell the trade-in houses.

A typical transaction would be somewhat as follows: Building Co. would offer a new house in Post Oak Manor for sale for $16,000. Mortgage arrangements on this new house could be made for $13,000. A prospective purchaser had a house that cost him $10,000 but was subject to an encumbrance of $8,000. He could buy Building Co.'s $16,000 home by paying $1,000 cash, deeding his old home to Terwil (subject to the $8,000 encumbrance) for which Building Co. would give him a $2,000 trade-in allowance, and making arrangements for a $13,000 mortgage on the new home to pay the balance of the $16,000 purchase price.

The way Building Co. would handle such a transaction in the above illustration would be to credit new house sales $16,000, debit cash $14,000, and debit "trade-in allowances" $2,000. Then on their consolidated income tax return petitioners would report sales of $16,000 and claim as a deduction, as an expense or as cost, the $2,000 "trade-in allowance." This means petitioners treated all of the trade-ins as worthless.

During the fiscal years ended April 30, 1956, 1957, and 1958, Building Co. accepted 151 trade-in houses and granted trade-in allowances on these houses in the total amount of $348,609.73, which was deducted on the consolidated return as a cost or expense. The outstanding encumbrances on these trade-in houses upon the date they were acquired by Building Co. totaled approximately $1,115,700. Respondent determined the $348,609.73 trade-in allowances could not be deducted as a cost or expense.

Section 1001(a) of the 1954 Internal Revenue Code provides that the "gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis,"

and section 1001(b) provides that the "amount realized * * * shall be the sum of any money received plus the fair market value of the property * * * received."

Petitioners now apparently agree that the trade-in allowances are not deductible as a cost or expense. Their position in their petition and on brief is that the aggregate fair market value of the trade-in houses was no more than the encumbrances against said houses and therefore their new house sales were overstated by $348,609.73.

In essence, therefore, the dispute turns upon whether the aggregrate fair market value of the trade-in houses received by Building Co. is at least equal to the aggregate trade-in allowances granted by Building Co., plus the outstanding encumbrances on trade-in houses. The burden was on petitioners to establish it was not. No point is made that Building Co. did not receive the trade-in houses even though title was taken by Terwil.

We are of the opinion that petitioners failed to sustain their burden. The evidence shows that Terwil Corp. was usually able to sell the trade-in houses within a few days after they were acquired, which makes the selling price fairly reliable as a measure of the fair market value of the houses when acquired by Building Co. The total selling price of 150 of these trade-in houses was about $1,503,500, which is in excess of the total of the trade-in allowances made by Building Co. on 151 houses ($348,609.73) and the encumbrances outstanding on these houses when acquired (about $1,115,700). It also appears that the difference between the selling price of 150 of the trade-in houses (about $1,503,500) and the encumbrances assumed by the purchasers of such houses (totaling about $1,110,900) was about $392,600, which certainly indicates that the equities in the trade-in houses were far from worthless, as petitioners seem to argue. For illustrative purposes, we can omit the outstanding encumbrances on the trade-in houses when first acquired by Building Co. and later when sold by Terwil Corp. It would then appear that Building Co. granted trade-in allowances on 151 houses in the amount of $348,609.73, which equaled the equities in such houses, and that Terwil Corp., in effect, sold these equities for about $392,600. It is true Terwil sold the trade-in houses with low downpayments but the sales contracts called for prices that actually exceeded the trade-in allowances plus encumbrances.

Respondent also introduced the testimony of two real estate appraisers whose appraisals of some of the 151 trade-in houses, chosen at random, amply shows that the fair market value of the trade-in houses was at least equal to the total of the outstanding encumbrances and the owners' equities in the trade-in houses.

704

We hold that petitioners failed to establish the aggregate fair market value of the trade-in houses was less than the trade-in allowances plus encumbrances against said houses. In fact the record affirmatively indicates the aggregate fair market value of such trade-in houses might well have been slightly more than allowances plus encumbrances.

There is no merit in petitioners' alternative argument that Building Co. sold the trade-in houses to Terwil Corp. at a loss amounting to the total of the trade-in allowances. Such an argument is clearly contrary to the actions of the parties as appears in the stipulations and in the record as a whole. Terwil Corp. was created as a convenient selling corporation, with the same shareholders as Development Co. (Building Co.'s parent), and Building Co. merely had the purchasers of new houses in Post Oak Manor subdivision deed their trade-in houses to Terwil Corp. We need not categorize the transaction (respondent argues it is a disguised dividend to Development Co. and its stockholders), but it will suffice to say that it was not a sale resulting in a loss to Building Co.

We hold for the respondent on this issue.

*Decision will be entered under Rule 50.*