Montclair Development Company v. Commissioner.
Montclair Development Co. v. Commissioner
Docket No. 3989-64.
United States Tax Court
T.C. Memo 1966-200; 1966 Tax Ct. Memo LEXIS 84; 25 T.C.M. (CCH) 1029; T.C.M. (RIA) 66200; September 13, 1966
*84 Land development company constructed sewer and water systems to serve its subdivision and provided such service to neighboring subdivisions. Development company transferred the systems to a related utility company. Utility company transferred the systems to a trustee for the benefit of homeowners in compliance with requirements of the Federal Housing Administration. Held: Because development company's primary purpose in constructing the systems was to further the sale of lots by it and because it parted with material property rights in the systems for the benefit of homeowners, development company was entitled to add the cost of the systems to its basis in lots sold by it. Estate of M. A. Collins, 31 T.C. 238 (1958); and Willow Terrace Development Co., 40 T.C. 689 (1963), affirmed 345 F. 2d 933 (C.A. 5, 1965), certiorari denied 382 U.S. 938 (1965), followed; Colony, Inc., 26 T.C. 30 (1956), distinguished. Alfred Swedlaw, 933 Bank for Savings Bldg., Birmingham, Ala., for the petitioner. Winfield A. Gartner, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: *85 The respondent determined deficiencies in the income tax of the petitioner as follows: Fiscal Year
Ended April 30
Deficiency
1958
$65,418.04
1959
72,206.35
1960
35,649.38
1961
17,452.77
1963
5,822.09
Petitioner disputed the deficiencies in their entirety with the exception of small amounts having to do with land cost allocations which have now been settled by stipulation. The sole issue remaining is whether petitioner properly included the cost of a water and sewer system in its basis in subdivision lots developed and sold by it. Some of the facts have been stipulated and are so found. Petitioner filed its income tax returns for the years in question with the district director of internal revenue, Birmingham, Alabama. Petitioner is a Florida corporation organized in 1957 to acquire some 325 acres of land about two miles from Pensacola, Florida, to develop the property, subdivide it into lots and sell the lots to building companies, the stock of which was owned by the shareholders of petitioner. The building companies constructed homes on the lots in accordance with standards of the Federal Housing Administration (hereinafter referred to as FHA) in *86 order to secure FHA or Veterans Administration (hereinafter referred to as VA) financing on mortgage loans. As a condition of issuing loan insurance or guarantees, the FHA required that the housing be serviced by adequate water distribution and sewage disposal systems. The VA had no separate requirements in this respect; the standards acceptable to the FHA were acceptable to it. The FHA would not approve sewer and water plans that had not previously been approved by the Florida state board of health. The board would not have approved septic tanks for the subdivision planned by petitioner. Petitioner sought to induce the City of Pensacola to extend its water and sewer facilities to serve the subdivision, but its efforts were unsuccessful. Petitioner then approached a private sewer company and a private water company, but they also declined. In October 1957 the shareholders of petitioner organized Montclair Utilities Corporation (hereinafter referred to as Utilities) to provide sewer and water systems for the subdivision. Two other developments were planned by others for land adjacent to petitioner's subdivision, which was called Montclair. Known by various names during the period *87 here in issue, the adjacent subdivisions were ultimately called Crescent Lake and Tristan Village. They will be referred to by those names throughout. The developers of Tristan Village submitted plans to the FHA on May 20, 1958, indicating that they hoped to build 357 homes on their land. On June 2, 1958, Utilities agreed to provide sewer and water service for Tristan Village. On July 8, 1958, petitioner agreed to provide land for and pay the cost of building water and sewer systems adequate to serve Montclair in consideration of Utilities' agreement to operate and maintain the systems. According to plans that had been filed with the FHA on August 29, 1957, 1,000 homes were planned for the Crescent Lake Development. On August 15, 1958, Utilities agreed to provide sewer and water facilities for that subdivision. Pursuant to the agreement of July 8, 1958, petitioner paid the cost of construction and furnished the land for sewer and water systems adequate to serve 1,000 lots, the projected capacity of the Montclair subdivision. The sewage treatment plant and the water distribution plant were completed by April 30, 1959. Installation of collection and distribution lines continued *88 throughout the years in question. The director of the bureau of sanitary engineering of the state board of health, whose approval of petitioner's plans was essential to FHA approval, urged petitioner to make provision for systems to serve more than 1,000 lot capacity of petitioner's subdivision in order to meet the possible future needs of other developers and builders who might come into the area. Accordingly, seven and one-half acres were set aside for such possible future expansion. Pursuant to the agreements of June 2, 1958, and August 15, 1958, the developers of the adjacent subdivisions were permitted to connect their sewer and water lines with the Montclair facilities. Petitioner treated the so-called "tap-in" fees from the other developers as contributions to capital, thereby reducing the over-all cost of the facilities to it. Respondent does not contest such treatment. Cf. Rev. Rul. 58-555, 1958-2 C.B. 25. Petitioner treated the over-all cost, so determined, as a land development cost and added the amount to its basis in the lots. Respondent disallowed corresponding portions of the amounts claimed by petitioner as deductions for the cost of lots sold, asserting *89 that petitioner had made capital expenditures not related to the lots. Petitioner has never claimed any depreciation, nor has Utilities, on the systems. The original water system's capacity was expanded by the construction of an elevated tank in 1961. The cost of the tank was paid by Utilities and it has taken depreciation thereon. The petitioner's shareholders were and are William P. Engle, Harry Strauss, Leo Mendel, and Russell V. Tinney, each of whom owns one-fourth of petitioner's issued and outstanding stock. Utilities has had ten shares of issued and outstanding stock during all times material to this proceeding. These shares were held from the organization of the company until July 1, 1958, equally, two and one-half each, by the shareholders of petitioner. On July 1, 1958, Mendel transferred his Utilities stock equally to his two sons. At the same time Engle transferred his Utilities stock equally to two trusts for the benefit of his grandchildren. Strauss also transferred his stock equally to two trusts for the benefit of his grandchildren. Tinney continued to own the Utilities stock issued to him. The FHA required that legal title to the water and sewage systems be *90 transferred to a trustee to insure performance of the duty of Utilities to supply services to lot customers. Accordingly, trust deeds were executed on August 14, 1958. They are supplemented by an agreement with the trustee, executed January 21, 1959, which extended Utilities' duties under the earlier trust deeds to homeowners in the Crescent Lake and Tristan Village subdivisions. By the terms of the trust deeds Utilities transferred title to the facilities to the trustee and obligated itself to operate the systems for the benefit of homeowners in accordance with rates and standards set forth therein, to maintain records, to make periodic tests and to comply with the standards of public bodies. In the event Utilities failed to comply with such requirements the trustee reserved the right to take immediate possession of the systems and to operate them for the benefit of homeowners. Utilities retained the right to reacquire ownership of the systems in the event they were taken over by a governmental authority or a public utility, or in the event that a governmental authority or public utility provided other adequate water distribution or sewage disposal services. Utilities had the right *91 to change rates, but if a change proposed by Utilities was opposed by more than one-third of those being serviced, and the parties could not reach an agreement, the controversy was to be submitted to arbitration. Those being serviced could also propose rate changes, and if agreements were not reached by the parties, the controversy was likewise to be submitted to arbitration. If Utilities charged rates in excess of those set by or determined under the procedures specified in the trust deeds the trustee had the right to take over and operate the systems. Rates for sewer service were raised from $3 per month to $3.50 in 1960. Petitioner's questioned expenditures were made primarily to further the sales of its lots in Montclair and petitioner did not retain full ownership and control of the water and sewage systems. A developer may add the cost of constructing a water or sewer system to his cost of lots sold where the project is undertaken primarily to further the sale of lots or houses and the developer parts with material property rights therein for the benefit of the subdivision lots. Estate of M. A. Collins, 31 T.C. 238 (1958), acq. 1959 2 C.B. 4. *92 Respondent argues that petitioner constructed the sewer and water systems primarily as an independent commercial venture and that even if they were built primarily to further the sale of lots, the rights retained amount to "full ownership and control." Cf. Colony, Inc., 26 T.C. 30 (1956), affirmed on other grounds 244 F. 2d 75 (C.A. 6, 1957), reversed on other grounds 357 U.S. 28 (1958). The first problem is therefore to determine the primary purpose of petitioner in making the expenditures it did. The main business experience of the shareholders of petitioner was in land development. [1] Tinney, the president of the company, had been employed by the FHA in Florida for 19 years beginning in 1934. Obtaining service for the Montclair subdivision marked the group's first venture into the utility business. In other subdivisions near Pensacola they had obtained sewer and water service under contracts with nearby private companies. This is what they attempted to do at Montclair. It was only after these and other efforts failed that they turned to constructing utilities themselves. *93 FHA or VA financing was essential to the marketability of the lots and of the homes to be constructed thereon. The state board of health would not have approved septic tanks for the Montclair subdivision. The shareholders of petitioner had no practical alternative but to go into the utilities business themselves. In addition to statements by them and their auditor that they entered the field reluctantly, the record contains testimony by the director of the bureau of sanitary engineering of the state board of health as follows: Q. What, if you know, was the attitude of subdividers generally and including the Montclair people, with respect to constructing and providing their own water and sewage facilities for subdivisions? A. I can truthfully say that I know of no developer that has ever been real happy with the decision that they had to put in a complete water system and a sewerage system. They - many of them, I can't say all of them, have said, they are in the business of building houses, they are not interested in running a utility program. Q. Yes, sir. A. So I feel, and I think with strong feeling, that I don't know of any at the first offset of development of this *94 program, was happy with it. Q. They would rather not have done it? A. They all argued that it would be a municipal or governmental activity. Q. And this included the Montclair people, too, did it not? A. I would certainly throw them in the barrel, yes, sir. Respondent sought to show that petitioner's shareholders knew when the expenditures were made that the utility business would be a profitable one, which it ultimately was. [2] There was testimony that petitioner's shareholders had some idea that with a system built for 1,000 lots, 500 customers would be the breakeven point, in that such number would assure sufficient revenue to recover construction and operating costs. Respondent asks us to add this to the fact that petitioner had a potential of over 2,000 customers and to conclude therefrom that petitioner knew its utilities operation would make money. *95 The profitability of the utilities operations depended upon the developers' success in marketing homes. There was no assurance (at the time the decision was made to go into the utility business) of how many lots would be sold. By September 1959, five months after the sewer and water plants had been completed, Utilities had 754 customers. [3] Its profit, allowing for depreciation, was $2,582.77 for that year. [4] The real estate market in the Pensacola area during this period was volatile. Petitioner sold no lots in 1962 (and hence no deficiency is asserted for that year.) At the end of the period in question it had sold 627 lots. [5]
*96 If the profitability of providing utilities to subdivisions in the Pensacola area was as certain as respondent would have us believe, it is difficult to understand why petitioner's shareholders went to the lengths they did to have others do the job. Cf. Commissioner v. Offutt, 336 F. 2d 483, 487 (C.A. 4, 1964), affirming a Memorandum Opinion of this Court. To be sure, petitioner purchased the tract in the hope that the building companies would be able to sell homes built thereon. The same is undoubtedly true of neighboring developers. In this connection respondent sought at trial to emphasize the business experience and acumen of petitioner's shareholders in land development ventures. Yet during the period here in issue petitioner's shareholders were also developing a site of comparable size near Clearwater, Florida, and were there ultimately required to construct their own sewer system. As it turned out only 200 homes were sold there, and that project resulted in a loss of $250,000. An investment banker with 25 years experience in utilities in the southeast testified that knowing what petitioner knew at the time Montclair was getting under way he would not have rated *97 the financing of water and sewer systems for it and the other subdivisions as a desirable investment. Petitioner was required to provide these facilities if it was to develop the subdivision at all. It had to provide them just as it had to clear the land, engineer the tract, provide drainage, paving, curbing, guttering and whatever else was necessary to develop the property into residential building lots. We have concluded that whatever hopes petitioner may have had of making a profit on its utilities venture did not constitute that degree of certainty which would permit us to find that its primary purpose was to make an independent investment in the utilities business. Even if we could say that at some point after September 30, 1959 (the end of Utilities' first profitable year), petitioner knew that the utility business would be profitable that would not end the case with respect to expenditures made after that time, which were for the installation of collection and distribution lines within the Montclair subdivision. The question would remain whether petitioner made those expenditures primarily to further the sale of lots. Expectations of profit are, of course, relevant on that *98 question, but as we stated in Willow Terrace Development Co., 40 T.C. 689, 701 (1963), aff'd 345 F. 2d 933 (C.A. 5, 1965), certiorari denied 382 U.S. 938 (1965): Respondent seeks to distinguish the Collins case by arguing that the developers of Post Oak Manor intended to make a profit from the operations of the Water Co. and actually operated at a profit for several years. We cannot agree with respondent's argument. As we read the Collins case, the pivotal consideration is whether the basic purpose for constructing such utilities systems in real estate subdivisions is to induce people to buy lots in such subdivisions. It is a question of fact, and in resolving it the profit and loss record of the operating company must, of course, be considered. But this does not mean that the presence of some profit will always be fatal to the taxpayers' case. * * * The sewer and water plants had been completed by April 30, 1959. The main task remaining after that time was to install collection and distribution lines to serve the lots within Montclair as they became occupied. Once having determined to build sewer and water plants itself petitioner had little *99 choice but to install the necessary lines as the need arose. Its motive in doing so was to that extent simply a continuation of its motive for the original decision to go into the utility business. That decision implied a continuing course of action beginning with the planning and construction of water and sewer plants and ending with the installation of collection and distribution lines. Further, although Utilities had begun to show a profit by September 1959, petitioner's expectations of continued profitable operation still depended to a large extent on its ability to sell lots and homes. That activity occupied most of its shareholders' time, energy and concern. Finally, petitioner's expert testified that even knowing what petitioner's shareholders knew as of September 30, 1959, he would not have regarded the financing of their utilities operation as a desirable investment. Bearing in mind that the taxpayer carries the burden of proof we have concluded that the later expenditures here in issue, like those for the sewer and water plants, were made primarily for the purpose of furthering the sale of homes and lots.
The question remains whether petitioner retained full ownership and *100 control of the sewer and water systems so that it cannot be said that petitioner gave up any property, or anything of value, in order to sell its lots. Petitioner first argues that the transfers of Utilities stock by Engle and Strauss to trusts for their grandchildren and by Mendel to his two sons, establish that Utilities was a separate corporation from petitioner. Ownership of the systems by Utilities, so their argument runs, precludes a finding that petitioner retained full ownership and control. [6] Respondent, however, attaches no significance to the transfers of stock. He apparently views the case as though the stock of petitioner and Utilities were owned by the same persons and in the same proportions, as was originally true. *101 There is nothing in the record to indicate the nature of the trusts to which Engle and Strauss transferred their shares. For all we know they might have been established by Engle and Strauss as settlors and be revocable by them. The transfer by Mendel to his two sons is likewise not shown by the record to have been significant with respect to establishing a separation between petitioner and Utilities. On this state of the record we adopt respondent's view, and we treat the case as though petitioner and Utilities were one. [7]
Petitioner next contends that the transfer in trust by Utilities to the trustee for the benefit of the homeowners amounted to a relinquishment by Utilities of full ownership and control over the systems. Petitioner relies on Willow Terrace Development Co., supra, *102 and Estate of M. A. Collins, supra. These cases involved fact situations similar to the instant case. In both, the shareholders of the development companies formed a utility company to provide sewer and water facilities for their subdivisions. The utility companies then transferred the facilities to a trustee for the benefit of homeowners. The trust deeds were drawn, as here, to conform with FHA requirements. In both cases the courts found that the developers' primary purpose in constructing the facilities was to further the sale of lots and held that there was a sufficient divestiture of ownership and control to permit the developers to add the costs of the facilities to their basis in the lots sold. In each of those cases, however, the trust deeds provided for fixed service fees. [8] In Collins the fee was set at a figure lower than the prevailing charge in the area. This low service charge made it impossible as a practical matter for the system to operate at a profit. In Willow Terrace the fee was also fixed, but it was not set so low as to prevent the company from operating at a profit, which it in fact did. The systems were ultimately sold to a nearby municipality *103 at a profit. *104 The deeds in the instant case set fixed fees, but Utilities is given the power to change rates, subject to the provision for arbitration in the event of disagreement. The precise question is whether this difference between the trust deeds here involved and those in Willow Terrace and Collins mandates a different result. We think not. Colony, Inc., supra, involved a developer who constructed a water system to serve his subdivision. There was no conveyance to a trustee for the benefit of homeowners as here. The developer retained full ownership and control of the facility. The court held that the retention of such rights required the taxpayer to take depreciation on the assets and precluded him from adding their cost to his basis in the lots. Retention of ownership and control is of significance in this respect because it carries with it the power to derive income from the assets either by their operation in an enterprise or by sale. The respondent's position is that when these two alternative methods of cost recovery are open to a developer he should not be able to add the cost of the assets to his basis in the lots. He distinguishes Collins as a case where the developer, *105 as a practical matter, had no way to recover his costs other than by adding them to his basis in the lots. This was so because the abnormally low service fees set by the trust deeds made it certain that the operation would be unprofitable. Respondent argues that this should be the only situation where a developer should be able to add the cost of utility systems to its basis in the lots. That same argument was rejected in Willow Terrace by this Court and by the Fifth Circuit. The Fifth Circuit stated: (345 F. 2d 938) The problem presented by these cases is whether deduction or capitalization of such costs will more accurately reflect the economic realities of the situation from the standpoint of the subdivider. We cannot accept the rule advocated by the Commissioner, which in effect allows deduction only when the costs can be recovered in no other manner. Some relevant factors to be considered in determining the proper tax treatment of the costs of such facilities are whether they were essential to the sale of the lots or houses, whether the purpose or intent of the subdivider in constructing them was to sell lots or to make an independent investment in activity ancillary *106 to the sale of lots or houses, whether and the extent to which the facilities are dedicated to the homeowners, what rights and of what value are retained by the subdivider, and the likelihood of recovery of the costs through subsequent sale. * * * In the instant case the prospects for profit were speculative at the time the trust deeds were executed and the rights retained were of uncertain value. Tax treatment should not be made to depend upon whether the operations were in fact ultimately profitable. It does not appear that Utilities had the power to sell its interest subject to its duties under the trust instruments. By the terms of the trust deeds Utilities retained the right to reacquire full legal title only in the event the systems were taken over by a governmental authority or a public utility, or in the event that a governmental authority or public utility provided other adequate water distribution and sewage disposal services to the area. Utilities' power to derive income from the assets by operation was materially restricted by schedules of rates and by important arbitration provisions. Utilities did not have the power to charge what the market would bear. Further, the *107 deeds contained provisions requiring Utilities to provide water and sewer service in accordance with standards set forth therein, to maitnain records, to make periodic tests and to comply with the standards of public bodies. In the event Utilities failed to comply with those requirements the trustee reserved the right to take immediate possession of the systems and to operate them for the benefit of the homeowners. We think that the combination of these limitations means that Utilities parted with "substantial beneficial property rights" in the systems, Collins, supra, p. 257, and did not retain full ownership and control within the meaning of Colony, Inc., supra. We have concluded that on the facts of this case, as in Collins and Willow Terrace, inclusion of the cost of the sewer and water systems in the basis of the lots would most fairly reflect the income received by petitioner during the years in question. Therefore we hold for the petitioner. Because of concessions, Decision will be entered under Rule 50. Footnotes
1. In addition to his operations in residential and commercial real estate, Engle also had experience in the mortgage loan business and owned an insurance agency.↩
2. If Utilities had taken depreciation on the cost of the sewer and water systems the operation would have been profitable. The profit, after depreciation, is shown in the following schedule: Fiscal Year Ending
9-30-58
9-30-59
9-30-60
9-30-61
9-30-62
Income Per Tax
$ (233.22)
$18,673.08 After net operating loss carryover deduction of $233.22
*↩
$34,611.62
$46,407.91
$36,234.00
Return
Less: Depreciation
3,386.91
12,703.40
16,930.11
17,675.36
17,734.92
Additional Net
Operating Loss
Carryover
3,386.91
Net Profit before
[3,620.13)
$ 2,582.77
$17,681.51
$28,732.55
$18,499.08
Income Tax
3. Schedule of Customers Served by Montclair Utilities Corporation ↩
9-30-58
9-30-59
9-30-60
9-30-61
9-30-62
9-30-63
Montclair
95
414
491
561
587
602
Development Co.
Subdivisions
Other
Subdivisions: Wildewood
237
321
323
310
314
(Tristan Village)
Crescent Lake
103
214
266
300
319
Total
95
754
1,026
1,150
1,197
1,235
4. See footnote 2, supra. ↩
5. The following schedule shows the lots developed and sold by petitioner for each of the years involved: [Schedule appears on following page.] ↩
Lots
Period
Developed
Lots Sold
5/20/57 to 4/30/58
174
174
Year ended 4/30/59
381
251
Year ended 4/30/60
73
112
Year ended 4/30/61
23
56
Year ended 4/30/62
20
Year ended 4/30/63
30
34
701
627
Inventory of lots on hand
74
6. Cf. Commissioner v. Offutt, 336 F. 2d 483, 487↩ (C.A. 4, 1964), affirming a Memorandum Opinion of this Court. There the taxpayer was permitted to deduct the cost of water and sewer facilities as a part of its cost of lots sold where the facilities were constructed for the purpose of furthering the sale of lots and were transferred to a utility company all of whose stock was owned by a 40 percent shareholder of the taxpayer. The utility company was organized as a public service company under the laws of Virginia and its rates were subject to regulation.
7. In that respect the instant case is therefore like Willow Terrace Development Co., 40 T.C. 689 (1963), affd. 345 F. 2d 933 (C.A. 5, 1965), certiorari denied 382 U.S. 938↩ (1965), where the stock of the utility company was owned by the same persons and in the same proportions as the stock of a company of which the building company was the wholly owned subsidiary.
8. In Willow Terrace, at the same time the deed transferring the sewer and water facilities from the building company to the utility company was executed the parties also executed an agreement which specified the exact rates to be charged for water services and the monthly flat rate for sewage disposal and garbage pickup. The agreement further provided that the rates set therein "shall not be increased in the absence of changed conditions, such as general increase in costs of materials or supplies or labor, or unanticipated conditions with respect to the water-bearing strata, or of other adverse conditions beyond the control of the Water Co. adversely affecting the supply of water to its well or wells, or in the absence of other changed conditions making such raise in the rates charged reasonably necessary; and such rates may be raised only if and when they shall prove insufficient to bear normal cost of operation, provide sufficient reserves for replacemtent, depreciation, and obsolescence, and provide a reasonable rate of return on the basis of capital investment." 40 T.C. 692-693. The specific rate provisions in the agreement were identical with those in the later trust deeds required to be executed by the FHA for the benefit of homeowners. It appears, however, that the provision in the transfer agreement for adjustment of rates was not incorporated in the trust deeds. See 40 T.C. 694↩.