694

HERZOG BUILDING CORPORATION, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 92607.   Filed August 2, 1965.

*Henry J. Jostock*, for the petitioner.
*Seymour I. Sherman*, for the respondent.

FORRESTER, *Judge:*   The respondent has determined deficiencies in petitioner's income taxes for the calendar years 1955 and 1956 in the respective amounts of $63,821.98 and $117,233.44.   The issues to be decided are (1) whether petitioner may deduct any part of an amount it agreed to pay for sewerage revenue bonds by allocating a part of such amount to its cost of lots sold to home buyers in 1955 and 1956; (2) whether petitioner may, by a similar procedure, deduct part of an amount it estimated it would become obligated to pay, under an oral agreement, as reimbursement to a related company for additional expenses incurred in the construction of a sewerage system; (3) whether petitioner is entitled to treat as a capital gain its profit on the sale of 53.12 acres of the Forke Farm in 1956; and (4) whether petitioner is entitled to treat as a capital gain its profit on the sale of 6.014 acres of the Haverly Farm in 1956.   A fifth issue was raised by the petition; but in view of petitioner's failure to present evidence or argument relating to such issue, we deem it to have been abandoned.

Some of the facts have been stipulated and are so found.

Petitioner is a corporation organized in 1951 under the laws of the State of Illinois; its principal office in 1955 and 1956 was in Des Plaines, Ill.   Petitioner filed its corporate income tax returns for the calendar years 1955 and 1956 on an accrual basis with the district

director of internal revenue, Chicago, Ill. During 1955 and 1956, and for several years prior thereto, petitioner was engaged in the business of acquiring unimproved land, subdividing the land, building houses thereon, and selling the houses. At all material times, E. A. Herzog (hereinafter sometimes referred to as Herzog) owned, directly or through nominees, all of petitioner's outstanding capital stock.

On November 30, 1954, petitioner acquired approximately 100 acres of land near the village of Wheeling, Ill. (hereinafter sometimes referred to as the village or Wheeling), for the purpose of subdivision and construction and sale of houses. Upon acquiring the property, known as the Forke Farm, petitioner caused it to be rezoned from farming to residential. In January 1955, petitioner acquired a 262-acre parcel of land known as the Techny Farm. The Techny Farm was about one-half to three-quarters of a mile west of the Forke Farm. At some undisclosed time it was annexed to the village of Wheeling. On May 23, 1955, petitioner acquired a 69-acre tract, known as the Haverly Farm, situated directly west of the Techny Farm.

In 1955, Wheeling had a population of about 900. It then had no sewers or sewerage disposal facilities and no funds available to provide a sewerage system. Early in 1955, petitioner applied to the village for approval of its subdivision plan for the Techny Farm and for the issuance of appropriate building permits. At a meeting of the trustees of the village in January 1955, Herzog, who was petitioner's president, was told that the subdivision would not be approved and building permits would not be issued until provision was made for an adequate sewerage system. Herzog was also told that the village had no funds for building such a system, that the only way to raise the money was by issuing bonds, and that no one had been willing to buy sewerage revenue bonds of the village. It was suggested that petitioner could buy the bonds, and at a subsequent meeting in January or February 1955, Herzog notified the village that petitioner would do so. Engineers employed by the village drew up plans for a sewerage system and estimated the cost thereof at $542,000. The plans and estimate were dated February 1955. By agreement dated April 11, 1955, petitioner agreed to purchase $542,000 of sewerage revenue bonds from the village. Petitioner's primary purpose for agreeing to buy such bonds was to enable it to develop its land. Subsequently, petitioner proceeded to subdivide and develop the Techny Farm for residential construction.

In or about June 1955, Wheeling's board of trustees passed an ordinance authorizing the issuance of 5-percent sewerage revenue

bonds[1] in the amount of $542,000. Between June 30, 1955, and December 31, 1955, petitioner purchased a total of $282,000 of such bonds. Petitioner bought an additional $57,000 of bonds in 1956 and $59,000 in 1957, raising the total amount of bonds purchased to $398,000. Bonds in the amount of $144,000 were unissued as of July 13, 1957.

The ordinance authorizing issuance of the Wheeling sewerage revenue bonds provided that 14 bonds per year would be redeemed from 1960 to 1990, 22 bonds per year from 1991 to 1994, and 20 bonds in 1995, and that all bonds could be redeemed on any interest date after December 31, 1959. It was further provided that additional sewerage revenue bonds could be issued, and if issued, such bonds would share ratably in the earnings of the sewerage system. Because the foregoing provisions were deemed unacceptable by many purchasers of and dealers in municipal bonds, and because in June 1955 there were not enough customers of the sewerage system to assure payment of principal or interest on the bonds, and because there was no convenient way to force sewerage system customers to pay their bills, the bonds issued by Wheeling were not considered marketable. The bonds were not worthless in 1955, but they were worth substantially less than face value. Whether or not they would become more valuable was largely dependent upon petitioner's success in selling houses in its subdivision project.

In October 1956, petitioner engaged the services of Paul D. Speer (hereinafter referred to as Speer), a municipal finance consultant, for the purpose of finding a way to liquidate its interest in the Wheeling sewerage revenue bonds. It was ultimately arranged for petitioner to sell its bonds, subject to the obligation to purchase the balance of the issue, to McDougal & Condon, Inc., a corporation which dealt in municipal bonds, and for the issue then to be refunded by the village through the issuance of $650,000 of water and sewerage revenue bonds under an acceptable ordinance. The agreement between petitioner and McDougal & Condon, Inc., was executed by May 16, 1957. On or about July 12, 1957, petitioner sold to McDougal & Condon, Inc., $398,000 face amount of village of Wheeling sewerage revenue bonds together with petitioner's right to purchase the remaining $144,000 of such bonds still unissued. McDougal & Condon, Inc., paid petitioner in respect of this transaction $289,000 and agreed to assume

---

[1] Revenue bonds differ from general obligation bonds in that principal and interest payments on the former may be made only out of the revenues of the facility with respect to which they are issued. Principal and interest on general obligation bonds are payable out of the general funds and tax revenues of the issuing authority.

petitioner's responsibility with respect to said unissued bonds in the amount of $144,000.

In June 1955, E. A. Herzog Construction Co. (hereinafter referred to as Construction) contracted with the village of Wheeling to build the sewerage system previously referred to. At all material times, E. A. Herzog owned, directly or through nominees, all of the outstanding capital stock of Construction. Construction was to be paid by Wheeling with the funds derived from the sale of its sewerage revenue bonds. After the ordinance authorizing the bonds had been passed, and after work on the sewerage system had commenced, the village requested certain changes in the depth, location, and directional flow of some of the sewer trunklines. The additional expense necessitated by such requested changes was estimated at $75,000. This amount was not covered by the original bond issue, and the village did not have other available funds sufficient to meet the increased cost. Authorization of an additional bond issue would have entailed considerable delay.

Petitioner had by this time sold a number of houses in the subdivision; its schedule of promised delivery dates made no allowance for delays. Under these circumstances, petitioner's president orally agreed that petitioner would reimburse Construction for the additional cost of incorporating the requested changes into the sewerage system.

As of December 31, 1956, petitioner estimated that Construction would incur costs of $75,000 in addition to the $542,000 originally estimated as the cost of building the Wheeling sewerage system. The sewerage system was completed sometime in 1957. On October 27, 1957, Wheeling and Construction canceled their contract respecting the sewerage system. During petitioner's fiscal year [2] ending March 31, 1958, the precise amount of such additional costs was ascertained, and such amount was then paid or credited by petitioner to Construction. The amount so paid or credited was about $74,000.

Despite the fact that, when petitioner acquired the Forke Farm in November 1954, it was for the purpose of subdivision and development, petitioner neither subdivided nor improved the Forke Farm. Petitioner made the following sales out of the Forke Farm to an unrelated homebuilder:

| Date | Acreage | Price |
|------|---------|-------|
| May 3, 1955 | 12.23 | $30,575.00 |
| Sept. 1, 1955 | 33.09 | 82,725.00 |
| May 1956 | 53.12 | 132,790.37 |

[2] Petitioner changed its tax accounting period from a calendar year to a fiscal year ending Mar. 31 by filing a return for the short period Jan. 1, 1957, to Mar. 31, 1957, and by thereafter filing a return for the fiscal year ending Mar. 31, 1958.

Of the 69 acres comprising the Haverly Farm, 59 were subdivided and developed as residential land and 10 acres were reserved for a shopping center. On October 1, 1956, 6.014 out of the 10 acres reserved for a shopping center were sold to an unrelated party, which constructed a shopping center thereon. Under the terms of the sale, petitioner was required to extend adequate water mains and sewers to the property sold.

Petitioner added $542,000, representing the entire amount of Wheeling sewerage revenue bonds it had agreed to purchase, to its cost of land. Portions of such amount were allocated to the cost of lots sold, and in this manner petitioner charged off as such costs $120,482.01 in 1955 and $267,312.83 in 1956. On its 1956 return, petitioner reduced the $267,312.83 by tax-exempt interest it received on the bonds during 1956 in the amount of $19,187.50, so that the amount actually included in cost of goods sold in 1956 was $248,125.33. In the statutory notice of deficiency, respondent determined that petitioner had overstated its cost of goods sold to the extent it had included therein any part of the cost of purchasing the Wheeling sewerage revenue bonds.

As of December 31, 1956, petitioner allocated the $75,000, by which it estimated the cost to Construction of completing the sewerage system would exceed the original estimate of $542,000, on its books in the following manner: $53,661.65 was included as part of cost of homes sold during 1956; the balance, $21,338.35, was added to the cost of unsold property. In the statutory notice of deficiency, respondent determined that petitioner was not entitled to include the foregoing amount of $53,661.65 in its cost of homes sold.

On its return for 1955, petitioner reported as ordinary income the gain from the two sales out of the Forke Farm made during the year. Petitioner reported no sales of capital assets on its 1955 return. On its return for 1956, petitioner reported as long-term capital gain the profit from the May 1956 sale of the final 53.12 acres of the Forke Farm. Petitioner also reported as long-term capital gain on its 1956 return the profit from the sale of 6.014 acres of the 10 acres of Haverly Farm reserved for a shopping center. Respondent determined that the gains from the 1956 sales of both the 53.12 acres and the 6.014 acres were ordinary income from sales in the ordinary course of petitioner's real estate business.

OPINION

The first issue concerns the correctness of respondent's determination that petitioner improperly included in its 1955 and 1956 cost of lots sold certain portions of the amount it had agreed to pay for Wheeling sewerage revenue bonds.

We must first dispose of a preliminary matter. During the course of the trial we allowed petitioner's chief accountant to testify as to what transpired at certain meetings of the board of trustees of the

village of Wheeling. Both the witness and petitioner's president were present at these meetings, which took place early in 1955. Respondent objected to the admissibility of such evidence on the ground that it was not the best evidence. Respondent argued that minutes are frequently taken at such meetings, and the minutes would be the best evidence of what took place at the meetings. According to respondent, oral testimony concerning the meetings was not admissible in the absence of a showing by petitioner either that no minutes were kept or that the nonproduction of the minutes was not due to any fault or neglect of petitioner. Respondent's objection is without merit.

The so-called best evidence rule is stated by McCormick, Evidence, sec. 196, p. 409, as follows:

in proving the terms of a writing, where such terms are material, the original writing must be produced, unless it is shown to be unavailable for some reason other than the serious fault of the proponent. * * *

This rule has no applicability to evidence of events or happenings which took place at such a meeting as is here in issue (as opposed to the end result or product, accomplished at such meeting) even where there happens to be a written or electronic transcription. McCormick, Evidence, sec. 198, p. 410. Petitioner is not trying to prove the contents of any minutes as such, but only the general tenor of what transpired at the meetings.[3] It may perhaps be true that minutes, if any, would provide a more accurate and reliable account of the events in question, but our system of evidence has no general rule requiring that the most accurate and reliable evidence in existence is the only evidence admissible to prove a fact. See *Allen* v. *W. H. O. Alfalfa Milling Co.,* 272 F. 2d 98 (C.A. 10, 1959); McCormick, Evidence, secs. 195–198; 4 Wigmore, Evidence, secs. 1173, 1174, 1179–1180, 1242 (3d ed. 1940).

As to the merits, it is firmly established that the costs of streets, sidewalks, public parks, and recreation areas are properly considered part of a subdivider's cost of lots sold. See *Country Club Estates, Inc.,* 22 T.C. 1283, 1293 (1954). Also, payments to utility companies to extend services to a new development are allocable to the cost of lots sold, even though the developer receives contingent rights to partial or complete reimbursement. *Albert Gersten,* 28 T.C. 756, 766 (1957), another issue modified 267 F. 2d 195 (C.A. 9, 1959); *Colony, Inc.,* 26 T.C. 30, 44 (1956), affirmed on other grounds 244 F. 2d 75 (C.A. 6, 1957), reversed on other grounds 357 U.S. 28 (1958); Rev. Rul. 60–3, 1960–1 C.B. 284. See also *Hallcraft Homes, Inc.,* 40 T.C. 199 (1963), affd. 336 F. 2d 701 (C.A. 9, 1964). Finally, it has consistently been

[3] In the instant case the evidence (testimony) was not offered as tending to prove the end result of the meetings, which was stipulated, but as tending to prove that petitioner's motive and purpose (acting through its executive officer) in purchasing sewerage revenue bonds was to enable petitioner to subdivide and develop its land, rather than to simply make an investment.

held that the cost of constructing a water or sewerage system for a new development may be added to the cost of lots sold, although the developer retains title to the facility, so long as the project was undertaken primarily to further the sale of lots or houses and the rights retained do not amount to "full ownership and control" of the facility constructed. *Willow Terrace Development Co.* v. *Commissioner*, 345 F. 2d 933 (C.A. 5, 1965), affirming 40 T.C. 689 (1963); *Commissioner* v. *Offutt*, 336 F. 2d 483 (1964), affirming a Memorandum Opinion of this Court; *Estate of M. A. Collins*, 31 T.C. 238 (1958). On the other hand, where a developer retained full ownership and control over the assets comprising a water supply system built in order to make its lots salable, it was held that the costs of the system could not be allocated to the cost of lots sold. *Colony, Inc., supra* at 46.

It is respondent's position that, because petitioner agreed to and did buy sewerage revenue bonds rather than build the sewerage system itself, and because petitioner at all times during the taxable years exercised full ownership and control over the bonds, petitioner may not, under *Colony, Inc., supra*, allocate the agreed price of the bonds to its cost of lots sold. We disagree, for the reasons hereinafter stated.

The evidence in the instant case convincingly establishes that the village of Wheeling would not have approved petitioner's subdivision plans, nor would it have issued building permits, until it was certain that an adequate sewerage system would be provided for the new area. We are satisfied that petitioner's purpose in agreeing to buy the Wheeling sewerage revenue bonds was to make possible the construction and sale of houses in the proposed subdivision, and was not to make an investment in the bonds. Considering this state of facts, we believe the soundest analysis of the case at bar will result from treating petitioner as having agreed to pay directly the costs of building the sewerage system. In this manner, the bundle of rights represented by the sewerage revenue bonds received by petitioner may be viewed in the most realistic perspective.

We are of the opinion that the instant case is in all material respects indistinguishable from *Albert Gersten, supra*. In *Gersten*, four corporations contracted with a water company to pay the water company's costs of extending its lines to subdivisions being developed by the corporations. The water company agreed in return to extend its lines, and also agreed to make payments to the corporations of approximately one-third of the gross receipts from the sale of water to houses in the particular subdivisions. Such payments were to be made for a maximum period of 10 years, but in no event were the corporations to receive more than the amounts they had originally paid. The corporations did not hold title to the facilities. The contracts were fully

transferable by the corporations; similar contracts were bought and sold; and the Court found that, 1 to 3 years after they were entered into, the contracts had fair market values at least equal to 50 percent of the maximum unpaid amounts. We held, for the petitioners, that the payments by the corporations to the water company were properly added to the cost of the subdivision property sold. The controlling facts were stated to be "that the corporations made unconditional payments to provide utility service for the subdivisions, and such payments were directly related to the property sold." 28 T.C. at 767. See also Rev. Rul. 60–3, *supra*.

Respondent, in emphasizing that petitioner in the instant case exercised full ownership and control of the sewerage revenue bonds, seeks to gloss over the fact that petitioner's only interest in the sewerage facility itself was a debt security, giving petitioner the right to be paid principal and interest out of the revenues of the system. The payments made by petitioner, in exchange for which it received certain rights (represented in this case by sewerage revenue bonds), were made to enable petitioner to build and sell houses on its land. The payments in *Gersten* were of the same nature, except that the rights received by the corporations there were embodied in contracts of a different form.

We do not deem it a material distinction that the contracts in the instant case provided for interest, for repayment according to a schedule, and for complete repayment out of revenues without a time limit, whereas the contracts in *Gersten* did not contain such provisions. These differences did not prevent the bonds received by petitioner from having value at time of issue substantially below the amounts paid by petitioner.[4] Nor did they guarantee that petitioner would be repaid a larger proportion of its payments or at a faster rate than the corporations in *Gersten*. In both cases, such factors were largely dependent upon the success of the subdivisions, a fact which further emphasizes the close relationship between the payments in question and the sale of the properties. Petitioner's income from the sale of lots will be more clearly reflected if a proportionate part of the amount it agreed to pay for the bonds is included in the basis of each lot sold. Cf. *Willow Terrace Development Co.* v. *Commissioner, supra; Colony, Inc., supra* at 48.

Respondent contends that, in any event, it is improper to permit petitioner to allocate $542,000, the amount petitioner agreed to pay to

---

[4] We do not consider such technical defects as the unorthodox maturity schedule of the bonds and the failure to limit the issuance of additional bonds as important causes of the low value of the bonds in 1955. We are satisfied that such defects, once recognized, could and would have been corrected with relative ease. Nor do we consider the lack of a convenient way to coerce customers of a sewerage system to pay their bills as an important factor, since the evidence indicates that sewerage revenue bonds with this characteristic are not uncommon. Whether the bonds would become valuable was primarily dependent upon whether petitioner's subdivision project was successful.

the village, to the cost of lots prior to the time the full amount was paid. It is clear that petitioner was obligated to pay the entire amount, and that the amount was related to all the lots in the subdivision. Under circumstances like these, where a builder is committed to making an expenditure for the benefit of a real estate development, it is well settled that the estimated expense may be added to the basis of the land prior to actual payment. *Colony, Inc., supra* at 44; *Cambria Development Co.,* 34 B.T.A. 1155 (1936).[5] Such treatment permits the income from the sale of each lot accurately to reflect a portion of all related costs.

The fact that petitioner eventually paid less than the full amount it had agreed to pay for the bonds does not, under the circumstances, affect the result. Respondent does not contend that as of the end of 1955 it was probable that petitioner would not have to buy the entire bond issue. Petitioner did not engage Speer, the municipal finance expert who was to find a way for petitioner to liquidate its interest in the bonds, until October 1956; the agreement to sell the bonds to McDougal & Condon, Inc., was not executed until May 1957. Petitioner's sale of its interest in the bonds was a separate, subsequent transaction which should not affect the allocation to basis in 1955. Cf. *Willow Terrace Development Co.* v. *Commissioner, supra; Cambria Development Co., supra.*

Although the taxable period during which petitioner disposed of its interest in the bonds is not before us, petitioner on brief seems to concede that the amounts received for the bonds constituted ordinary income. See *Hallcraft Homes, Inc., supra.*

We hold on this first issue for petitioner.

The second issue is whether petitioner is entitled to allocate to its cost of lots, as of December 31, 1956, an amount which it estimated it would have to pay Construction as reimbursement for the additional cost of incorporating into the sewerage system certain changes desired by the village of Wheeling. Petitioner claims it is entitled to include this amount as an estimated development expense. See *Colony, Inc., supra* at 44; *Cambria Development Co., supra.*

We are of the opinion, however, that the item here in question is not an estimated expenditure of the type which, under the rule of *Cambria Development Co., supra,*[6] may be allocated to basis prior to accrual or payment. A careful reading of the cases discloses the following rationale for allowing allocation to basis: Where a developer is bound by contract to make certain improvements for the benefit of the property sold, the fact that the expenditure required to install the improvement is not made during the taxable period within which part of the

---

[5] See also the discussion, *infra,* with respect to the second issue.
[6] See also *Birdneck Realty Corporation,* 25 B.T.A. 1084 (1932) ; *Milton A. Mackay,* 11 B.T.A. 569 (1928) ; O.D. 567, 3 C.B. 108. Cf. *Fairfield Plaza, Inc.,* 39 T.C. 706, 713 (1963).

property is sold should not prevent an aliquot portion of the cost from being offset against the profit from the sale of the property. See *Milton A. Mackay, supra*.

The evidence shows that, after construction of the sewerage system had begun, the village decided that certain changes were desirable. We do not know whether, if the changes had not been agreed to, the village could legally have interfered with the construction of the sewerage system or with the construction and delivery of petitioner's houses. Nevertheless, petitioner's president, fearing the adverse consequences of possible delays, orally agreed that petitioner would reimburse Construction for the additional cost of effecting the desired changes in the sewerage system. Even if we assume that the oral agreement constituted a contract enforceable against petitioner, it does not appear that such contract was entered into to satisfy any pre-existing obligation of petitioner. We are of the opinion that, whatever the nature of the obligation incurred by petitioner, it was not one for the benefit of lots previously or subsequently sold and hence properly allocable to the cost thereof. Rather, the obligation apparently was undertaken to benefit petitioner's operations generally, by avoiding the costs and embarrassments which delay might have produced. Thus, the estimated expenditure was not so closely related to specific property as to make an allocation to basis necessary to reflect clearly the income from the sale of property. Whether the amount later paid by petitioner to Construction would be deductible as an ordinary and necessary business expense in the year of payment is a question not now before us.[7] In any event, we are satisfied that petitioner was not entitled in 1955 or 1956 to allocate to cost of lots its estimated liability to Construction. We hold for respondent on this issue.

The third issue is whether respondent erred in determining that petitioner's gain from the sale of 53.12 acres of the Forke Farm in May 1956 constituted ordinary income, rather than capital gain as reported by petitioner.

Petitioner acquired the Forke Farm on November 30, 1954, for the purpose of subdividing it, building houses on the lots, and selling the houses. In furtherance of this purpose, petitioner caused the Forke Farm to be rezoned from a farming to residential classification. However, petitioner neither subdivided nor improved the Forke Farm, although petitioner did subdivide and develop two subsequently acquired nearby tracts, the Techny Farm and the Haverly Farm.

On May 3 and September 1, 1955, petitioner sold 12.23 and 33.09

---

[7] Petitioner does not claim the amount so paid had accrued during the taxable years. Since it does not appear that the work was completed by Construction or that the amount to be paid was ascertained before the end of 1956, such a claim probably would have to be rejected.

acres, respectively, of the Forke Farm. Petitioner reported the gain from these sales as ordinary income. The only issue is raised by petitioner's assertion that it properly treated as capital gain its profit from the sale of the remaining 53.12 acres in May 1956. Petitioner relies upon *Eline Realty Co.*, 35 T.C. 1 (1960), *Charles E. Mieg*, 32 T.C. 1314 (1959), and *Carl Marks & Co.*, 12 T.C. 1196 (1949).

That petitioner acquired the Forke Farm for the purpose of development and sale to customers in the ordinary course of its business does not, ipso facto, prevent petitioner from prevailing on this issue. To do so, however, petitioner must prove sufficient facts to satisfy us that at the time of sale its purpose for holding the property had changed to an investment purpose. *Eline Realty Co., supra; Alice E. Cohn*, 21 T.C. 90, 99–100 (1953), affd. 226 F. 2d 22 (C.A. 9, 1955).

Aside from the bare fact that petitioner reported the item in question as a capital gain, the only evidence supporting petitioner's claim of a change in its purpose for holding the Forke Farm from one of sale to customers to one of investment is the following testimony of James R. Jackson (hereinafter referred to as Jackson), petitioner's assistant secretary and chief accountant during the period 1953–56:

A. Well, the reason the Forke Farm wasn't subdivided by us was that we were—the petitioner at the time was developing the Techny Farm, he had acquired additional acreage around the Techny Farm. Houses were selling very very fast in the Techny Farm area, and the petitioner knew from his previous experience that land nearby where there was tremendous construction activity always did rise in value so he held onto it as an investment for speculation.[8]

Opposed to this evidence is petitioner's treatment of the gain from the first two sales out of the Forke Farm as ordinary income; the short period of time between acquisition of the property and the sales; and the lack of contemporaneous evidence, such as book entries, to corroborate the claim that there was a change in the purpose for which the property was held and to indicate the time when such a change might have taken place. Compare *Donald J. Lawrie*, 36 T.C. 1117 (1961).

After carefully weighing the evidence, we are of the opinion that petitioner herein has failed to carry its burden of proof on this question. It then follows from sections 1201, 1221, 1222, and 1231 of the 1954 Code that respondent's determination must be sustained. The cases relied upon by petitioner are distinguishable, since in those cases there was satisfactory evidence that the properties in issue were held for investment purposes.

The final issue is whether respondent erred in determining that petitioner's gain from the sale of 6.014 acres of the Haverly Farm on

---

[8] It is clear that the witness was referring to petitioner's president, E. A. Herzog, as the petitioner.

October 1, 1956, was ordinary income, rather than capital gain as reported by petitioner.

Petitioner purchased the Haverly Farm, a tract consisting of 69 acres, on May 23, 1955. Petitioner subdivided 59 acres for residential development and reserved 10 acres for a shopping center. Petitioner claims, and Jackson testified, that petitioner had originally intended to build and own the shopping center itself and, in furtherance of this plan, had engaged an architect, who prepared plans for a shopping center for the site. Petitioner claims further that its failure to get enough lease commitments from prospective tenants for the shopping center prevented it from obtaining financing for the project, which was then abandoned.

In support of its claim that it intended to build and own the shopping center, petitioner introduced in evidence copies of an artist's conception of the proposed shopping center and a plan of the shopping center. The shopping center plan, however, lists "Herzog Realty Company" as the owner, and the same name appears on the artist's drawing. These are the only references to Herzog Realty Co. we have been able to find in the record. The existence of Construction as an entity separate from petitioner establishes that E. A. Herzog conducted his affairs through more than one controlled company. If Herzog intended petitioner to build the shopping center, then sell it to another company, it seems clear that petitioner held the 10-acre tract for sale to customers in the ordinary course of its business. Jackson's testimony does not foreclose this possibility, since Jackson made no reference to Herzog Realty Co. Furthermore, Jackson, in his testimony, frequently failed to draw a distinction between Herzog and petitioner. That Herzog might have intended another of his companies to own the shopping center is of no help to petitioner.

Since petitioner has failed to carry its burden of proving that the 10-acre tract of the Haverly Farm was not held for sale to customers in the ordinary course of business, respondent must prevail on this issue.

*Decision will be entered under Rule 50.*