BRYCE'S MOUNTAIN RESORT, INC., STONEY CREEK UTILITIES, INC., BLUE KNOB RESORT, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bryce's Mountain Resort, Inc. v. Commissioner
Docket No. 26382-82.
United States Tax Court
T.C. Memo 1985-293; 1985 Tax Ct. Memo LEXIS 338; 50 T.C.M. (CCH) 164; T.C.M. (RIA) 85293; June 19, 1985
Jerry L. Bowman, for the petitioners. William L. Ringuette, for the respondent. DAWSON
DAWSON, Judge: Respondent determined deficiencies in petitioners' consolidated Federal income taxes as follows: Taxable Year Ended
Deficiency
October 31, 1972
$376,368.08
October 31, 1973
1,744,701.83
October 31, 1974
1,462,056.15
October 31, 1975
611,986.74
October 31, 1976
10,839.32
October 31, 1977
255,083.27 After concessions, the issues remaining for decision are (1) whether the estimated cost of future *339 improvements to be incurred by Bryce's Mountain Resort, Inc. and Blue Knob Resort, Inc., is includable in the basis of lots sold; (2) whether the actual cost of water and sewer systems constructed by Bryce's Mountain Resort, Inc. and Blue Knob Resort, Inc., to service their real estate subdivisions is includable in the basis of the lots in the subdivisions; [1] (3) whether a loss was sustained by Blue Knob Resort, Inc., in the taxable year ended October 31, 1975, or in the taxable year ended October 31, 1976; and (4) whether Bryce's Mountain Resort, Inc., understated its income from property sold in the taxable year ended October 31, 1977. FINDINGS OF FACT The facts were stipulated pursuant to Rule 122. [2] The stipulation of facts and joint exhibits are incorporated herein by this reference. Bryce's Mountain *340 Resort, Inc. (hereinafter referred to as Bryce's Mountain), a Virginia corporation, was organized in 1965 by Paul Brice to develop and sell real estate in Bryce, Virginia. Bryce's Mountain, an accrual basis taxpayer, kept its books and records on a fiscal year ended October 31. In 1970 Bryce's Mountain formed a wholly-owned subsidiary, Stoney Creek Utilities, Inc. (hereinafter referred to as Stoney Creek), a Virginia corporation, to which it transferred its existing sewer systems. Stoney Creek was a public utility subject to regulation by the Commonwealth of Virginia. Since its formation, Stoney Creek has undertaken the development of sewer systems on lots sold by Bryce's Mountain. In 1972 Bryce's Mountain acquired an 82 percent interest in Blue Knob Resort, Inc. (hereinafter referred to as Blue Knob), a Pennsylvania corporation. Blue Knob was engaged in real estate development in Claysburg, Pennsylvania. During the taxable years at issue, Bryce's Mountain, Stoney Creek and Blue Knob filed consolidated corporate income tax returns. All returns were timely filed with the District Director of the Internal Revenue Service Center in Memphis, Tennessee. Facts Relating *341 to Issues 1 and 2
Bryce's Mountain and Blue Knob converted raw land into residential building lots. They financed their projects with loans from commercial banks. Their loan agreements provided that Bryce's Mountain and Blue Knob would continue development in accordance with their "Master Plan and Feasibility Study." [3] Bryce's Mountain began selling lots in 1970, and Blue Knob began its sales in 1972. As part of their projects, both Bryce's Mountain and Blue Knob built roads and water and sewer systems to service the lots. [4] The principal purpose for these improvements was to make the lots more salable. Both Bryce's Mountain and Blue Knob estimated the costs of these improvements and allocated the estimated costs to the various lots thereby increasing the basis of each lot sold. [5] Bryce's Mountain began making improvements in 1973. The improvements have yet to be completed, but are continuing to be made. Bryce's Mountain and Blue Knob also constructed recreational facilities. Both Bryce's Mountain and Blue Knob retained legal ownership and control of the systems during the taxable years at issue. Neither Bryce's Mountain nor Blue Knob maintained an escrow account *342 or specifically set aside any funds to ensure completion of the roads or water and sewer systems. The water and sewer systems were not independently profitable for the years in question and it was not probable that they would soon become profitable. Prospective purchasers of lots at Bryce's Mountain and Blue Knob were informed orally by salesmen that the developer would install a water and sewer system by the time the purchaser was ready to build upon the property. The purchaser was also informed that roads would be constructed to provide access to all lots. Several lot owners attested *343 that they relief upon these oral representations in purchasing their lots. Each lot owner was required to pay $1,500 to Bryce's Mountain when water and sewer services were made available. This money was included in gross income as proceeds from the sale of lots. A typical sales agreement signed by each purchaser included the following language: SELLER AND PURCHASER AGREES [SIC] THAT THIS AGREEMENT IS THE ONLY AGREEMENT BETWEEN THEM AND THAT NO REPRESETATIONS, ORAL OR WRITTEN, HAVE BEEN MADE OR RELIED UPON WHICH ARE NOT HEREIN PROVIDED OF SET FORTH, AND THAT THIS AGREEMENT IS SUBJECT TO WRITTEN ACCEPTANCE OF SELLER. Prospective purchasers were also provided with Housing and Urban Development (HUD) property reports pursuant to the requirements of the Interstate Land Sales Act. The reports provided, among other things, that "there [was] no assurance, other than the promise of the Developer, that the subdivision roads [, water and sewer systems would] be completed." The roads, water wells and sewer systems were developed by unrelated third parties pursuant to construction contracts entered into by Bryce's Mountain, Stoney Creek and Blue Knob. The initial cost *344 of these improvements was estimated at $550 per lot. In 1973 it was found that the actual cost of these improvements was about $1,100. Therefore, for lots sold during and after the fiscal year 1973, the basis was adjusted by $1,100. [6] For lots sold prior to 1973, the $550 figure was used. Bryce's Mountain and Blue Knob made several attempts to dispose of their interests in the water and sewer systems but were unsuccessful. Bryce's Mountain offered to donate its 100 percent stock ownership in Stoney Creek to the regional public authority operating water and sewer systems in Shenandoah County, Virginia. The authority refused to take over the operation of Stoney Creek because Stoney Creek was operating at a loss. The property owners at Bryce's Mountain were offered all of the stock of Stoney Creek for no consideration except the obligation to maintain and operate the utilities for present and future lots. This offer was not accepted by the property owners because they could not afford to operate the utilities at a loss. The stock in Stoney Creek was finally *345 sold to Paul Brice, the developer of Bryce's Mountain, for $100 plus the assumption by Stoney Creek of all future extensions of the water and sewer systems. Bryce's Mountain transferred its ownership in all water lines, pumps, sewer lines, plants, equipment and construction monies [7] (amounting to about $575,000), to Stoney Creek, along with $50,000 cash and forgiveness of all indebtedness that Stoney Creek owed Bryce's Mountain. Facts Relating to Issue 3
On October 17, 1975, Blue Knob entered into an agreement to sell its recreational facilities to Blue Knob Recreation, Inc. (hereinafter referred to as Recreation). The agreement was evidenced by a contract of sale which provided, in part, as follows: Pending closing under this Agreement, Purchaser shall be entitled to use and occupy all of the realty, machinery and other personalty being acquired hereunder and shall be entitled to, without cost or other obligation, to all proceeds and other emoluments of such use and occupation.Purchaser agrees that *346 by such purchase and use as well as his entitlement to the profits, he shall bear all expenses including mortgage payments during the period from October 31, 1975, to the date and day of closing. It is the intention of this Agreement to create a binding purchase and sales agreement between the parties hereto, while at the same time to permit the Purchaser hereunder to occupy and use the assets set forth herein, both real and personal, as through the same were his, commencing at the close of business on October 31, 1975, and continuing to the day and date of closing. Recreation took physical possession of the facilities on October 31, 1975, the last day of Blue Knob's taxable year.Approval of the sale did not occur until the following taxable year, where at a special meeting on November 1, 1975, Blue Knob's shareholders approved the sale. Then on November 3, 1975, Blue Knob's Board of Directors unanimously approved the sale. The actual closing on the sale did not occur until January 9, 1976, when all documents were executed, including the assumption by Recreation of Blue Knob's mortgages and leases, and the execution of a mortgage and a down payment to Blue Knob by Recreation. *347 For tax purposes Blue Knob and Recreation treated the sale as occurring in the fiscal year ended October 31, 1975. Facts Relating to Issue 4
Bryce's Mountain sold a parcel of land in the fiscal year ended October 31, 1977, designated as Lot 69 of Section 9. In connection with this sale, Bryce's Mountain debited on its books interest income of $2,564.85 and credited lot sales by a like amount. It excluded the sale of the lot from its taxable income on its Federal income tax return filed for that fiscal year. Based upon the foregoing actions by Bryce's Mountain, respondent determined that Bryce's Mountain understated its income by $2,564.85 for the fiscal year ended October 31, 1977. OPINION Issue 1. Future Improvements
Petitioners contend that they are entitled to include the estimated cost of future improvements in their basis of lots sold because they were legally obligated to make the improvements. They argue that they were legally obligated because of the following: (1) oral representations that the improvements would be completed had been made to the purchasers by petitioners' salesmen; (2) the purchasers were third party beneficiaries of petitioners' *348 contractual obligation with the bank to make the improvements; and (3) an enforceable obligation grew out of the HUD property reports. Petitioners further contend that, without regard to legal theories of liability, adding the estimated cost of the improvements to the basis of lots sold is required to properly match income and expenses. Therefore, they assert that the adjustment to basis was proper. Respondent contends that in order for petitioners to be able to include the estimated cost of future improvements in the basis of lots sold, they must be contractually obligated to make the improvements. He argues that if petitioners are not required to make these improvements in the contracts for sale of the lots, then they are not entitled to add the estimated costs to the basis of lots sold. Respondent notes that the evidence fails to indicate that petitioners were contractually obligated to make the improvements and, in fact, is indicative of the opposite conclusion, i.e., that petitioners were not so obligated. Respondent asserts that petitioners may not include the estimated cost of future improvements in the basis of lots sold because the only obligation they had *349 to make such improvements was a moral one. For the reasons set forth below, we agree with respondent. It is a well-settled principle of law that estimated cost of future improvements may be included in the basis of property sold if the improvements to the property are required by the contract of sale. Herzog Building Corp. v. Commissioner,44 T.C. 694 (1965); Cambria Development Co. v. Commissioner,34 B.T.A. 1155 (1936). Here there was no contractual requirement that the improvements be made. In fact, purchasers of the lots were informed in the HUD property reports that no money had been set aside to complete the improvements and that the purchaser had no assurance other than the promise of the developer that the improvements would be completed. Petitioners contend that the oral representations made by their salesmen are sufficient to establish that they were contractually obligated to make the improvements. We disagree. We do not view these oral comments as sufficient to form a binding contract, Herzog Building Corp. v. Commissioner, supra at 703, *350 especially in light of the fact that the sales agreements signed by the purchasers specifically provided that no oral representations had been made or relied upon by either party. We are also not convinced that the purchasers could sue to force the completion of the improvements using the theory that the purchasers were third party beneficiaries of petitioners' contracts with the banks that loaned petitioner money to make the future improvements. Petitioners' loan agreements did provide that development would continue as provided in the "Master Plan and Feasibility Study" unless the banks gave prior written approval to alter this agreement. However, petitioners have offered no evidence that the construction of these future improvements was part of the "Master Plan and Feasibility Study." Therefore, we do not view the costs in question as allocable to basis prior to accrual or payment. Accordingly, we hold for respondent on this issue. Issue 2. Water and Sewer Systems
Petitioners next contend that the actual cost of water and sewer systems constructed to service their subdivisions is includable in the basis of lots sold in the subdivision. They state that *351 their primary purpose in constructing the water and sewer systems was to make the lots more salable. They argue that there never has been any reasonable prospect that the water and sewer systems would be profitable. They note that they attempted to dispose of the systems but were unsuccessful. Based upon the above arguments, petitioners assert that their income from the sale of the lots will be more clearly reflected if they are allowed to include the actual cost of the water and sewer systems in the basis of lots sold. To the contrary, respondent contends that petitioners may not include the actual costs of the water and sewer systems in the basis of lots sold because they retained full ownership and control of the systems during the taxable years at issue. Respondent further contends that, although the water and sewer systems were not independently profitable, petitioners retained substantial beneficial property rights in the systems because they served as their recreational facilities.Respondent also points out that the water and sewer systems were never dedicated to the lot owners, and that each lot owner was charged for his use of the systems. Respondent argues *352 that these factors indicate that the water and sewer systems were an independent investment by petitioners, in part to benefit their recreational facilities, and therefore the cost of the systems cannot be added to the basis of the lots sold. A developer's cost of constructing a water or sewer system may be added to the basis of lots sold by the developer where the principal purpose for constructing the system was to encourage people to buy the lots. DerbyHeights, Inc. v. Commissioner,48 T.C. 900, 904 (1967). However, if the developer retains rights in the system that amount to a retention of full ownership and control, the cost of the system cannot be added to the basis of lots sold, Willow Terrace Development Co. v. Commissioner,40 T.C. 689 (1963), affd. 345 F.2d 933 (5th Cir. 1965), but must be capitalized and depreciated over its useful life. The parties have agreed, and we so find, that the principal purpose for constructing the water and sewer systems was to advance the sale of the subdivision lots. The remaining *353 question is whether full ownership and control was retained by petitioners in the water and sewer systems so that it cannot be said that they gave up any property or anything of value in order to sell their lots. We think the facts of this case are indistinguishable from Colony, Inc. v. Commissioner,26 T.C. 30 (1956), affd. on another issue 244 F.2d 75 (6th Cir. 1957), revd. on another issue 357 U.S. 28 (1958) and, therefore, we hold for respondent on this issue. In Colony, the taxpayer constructed a water supply system in order to make its lots more salable. It continued to own and operate the system at a loss during the taxable years at issue. We held that since the taxpayer retained full ownership and control of the system and did not part with the property for the benefit of the subdivision lots, the cost of the water supply system could not be added to the basis of the subdivision lots sold. Colony, Inc. v. Commissioner.26 T.C. 26 45-46; see also Biscayne Bay Islands Co. v. Commissioner,23 B.T.A. 731 (1931). We recognize that the principal purpose for constructing the water *354 and sewer systems, in this case was to make the lots more salable. Aside from this principal purpose, however, there is an additional consideration which we think is significant and indicates that the systems were constructed by petitioners for an independent investment purpose. That is the fact that the recreational facilities of both Bryce's Mountain and Blue Knob were serviced by the water and sewer systems. The recreational facilities of Bryce's Mountain included a ski facility, an 18-hole golf course, tennis courts, a restaurant and club, a 45 acre lake, and other facilities. Blue Knob had a ski facility, a golf course, tennis courts, a swimming pool, riding stables and a restaurant. The benefit to petitioners of owning their own water and sewer system to service these facilities was substantial. Hence, while the systems did not appear profitable based upon the revenue obtained from subdivision lot owners, this figure does not include the substantial benefit to petitioners from having the systems service their recreational facilities. Petitioners rely heavily upon Derby Heights v. Commissioner,48 T.C. 900 (1967), in support of their contentions. *355 In Derby Heights, the taxpayer was a real estate developer. To further the sale of lots in his subdivision, the taxpayer constructed waterlines for the lots. These lots were then taken by a nearby city under its power of eminent domain. The taxpayer sued for and received compensation for the taking. We held that the waterlines did not constitute property used in the trade or business of petitioner under section 1231 and that the gain on the taking was not to be treated as long-term capital gain. In so holding, we found that the waterlines were improvements to the development, the cost of which were added to the basis of lots sold in the subdivision. There are several factors that make this case distinguishable from Derby Heights,supra.[8] First, the taxpayer in Derby Heights did not obtain a substantial direct benefit from the construction of the waterlines, other than perhaps increased lot sales. By contrast, petitioners' recreational facilities are serviced by the systems. In addition, the taxpayer in Derby Heights constructed only waterlines. Here petitioners' undertaking was more substantial and thus more likely to be viewed as an independent *356 investment since it was a complete water and sewer system. We are not persuaded by petitioners' contention that they attempted to dispose of the systems but were unsuccessful. The fact remains that petitioners were the sole owners of the systems during the taxable years at issue. Accordingly, we sustain respondent's determination that the water and sewer systems should be capitalized and depreciated over the useful lives of the systems. Issue 3. Year of Loss Sustained by Blue Knob
Next we address the issue of whether Blue Knob's loss on the sale of its recreation facilities *357 to Recreation was sustained in its taxable year ended October 31, 1975 or its taxable year ended October 31, 1976. Blue Knob contends that the loss occurred in its taxable year ended October 31, 1975, because Recreation was allowed to take physical possession of the properties on October 31, 1975. It also contends that the contract of sale allowed Recreation to use and occupy all of the property, equipment and other personalty and also provided that Recreation was responsible for all expenses including mortgage payments from October 31, 1975, until the date of closing. Based on these contentions, Blue Knob argues that it is clear that the sale occurred in the taxable year ended October 31, 1975, when the benefits and burdens of ownership passed to Recreation. Respondent contends that the loss on the sale did not occur until Blue Knob's taxable year ended October 31, 1976, because the sale was approved by the shareholders on November 1, 1975, and by the Board of Directors on November 3, 1975. Respondent also stresses that the actual closing on the sale did not occur until January 9, 1976, at which time Recreation executed all the appropriate documents, assumed all *358 of the mortgages and leases, executed a mortgage to Blue Knob, and made the required down payment. Respondent argues that since the actual closing and approval of the sale did not occur until January 9, 1976, the agreement entered into on October 17, 1975 was nothing more than an executory agreement to sell. We agree with respondent. Section 165(a), Internal Revenue Code of 1954, allows a deduction for losses sustained during the taxable year. Here we must decide when the sale and resulting loss was sustained. That depends upon when Recreation became the owner of the property. Ownership of property is an elusive concept but occurs when a person possesses a bundle of rights with respect to that property. Merrill v. Commissioner,40 T.C. 66 (1963), affd. 336 F.2d 771 (9th Cir. 1964). One of the rights in the bundle is the power to convey title to property, clear and unencumbered. In Re Estate of English,206 N.W. 2d 305 (Iowa 1973); In Re Estate of Pick,186 Neb. 828, 186 N.W. 2d 919 (1971). The *359 fact that a person is in possession of property does not in and of itself establish title to it. Hibiscus Harbor, Inc. v. Ebersold,280 N.Y.S. 2d 44 (N.Y. Co. Ct. 1967); Price v. Manley,114 Ga. App. 390, 151 S.E. 2d 537 (1966). Here the fact that Recreation was in possession of the property on October 31, 1975, is not conclusive in establishing that it was the owner of the property. Recreation could not have conveyed title to the property, a right that is indicative of one's ownership of property, until the closing occurred. It was not until the closing that Recreation received a deed to the property. In addition, it was not until closing that Recreation assumed the mortgages and leases on the property, executed the formal documents, made a down payment and executed a mortgage to Blue Knob on the property. [9] Furthermore, the sale was not approved by the shareholders or the Board of Directors until the taxable year ended October 31, 1976.All of the above actions were yet to be completed at the conclusion of Blue Knob's taxable year ended October 31, 1975. Consequently, we hold that Blue Knob's loss on the sale of its recreation *360 facilities was sustained in the taxable year ended October 31, 1976, when the sale occurred. Issue 4. Understatement of Income
The final issue is whether Bryce's Mountain understated its income from the sale of Lot 69 of Section 9 in its fiscal year ended October 31, 1977. Respondent's determination is presumed correct. Petitioner has the burden of proof. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). It has failed to carry it. Accordingly, we sustain respondent's determination. To reflect petitioners' concessions and our conclusions with respect to the disputed issues, Decision will be entered under Rule 155.
Footnotes
1. Our resolution of issues 1 and 2 will be dispositive of whether Bryce's Mountain Resort, Inc. can include the estimated cost for future improvements and actual cost of water and sewer systems in the basis of lots sold to Great North Mountain Corp. and Judy Burner during the taxable year ended October 31, 1977.↩
2. Tax Court Rules of Practice and Procedure.↩
3. No evidence was offered by petitioners as to the specifics of this plan. ↩
4. In actuality, the sewer system serving Bryce's Mountain was furnished by Stoney Creek. Initially Bryce's Mountain agreed to pay Stoney Creek $1,200 for each lot supplied with sewer services. This amount was increased to $1,500 in 1972, and to $2,300 in 1973. For the sake of simplicity, however, at times we will not distinguish between Bryce's Mountain and Stoney Creek when discussing ownership of the sewer systems. ↩
5. Respondent does not contest the reasonableness of the amounts of these estimates.↩
6. If such adjustment to basis was proper, respondent does not dispute this increase in the basis adjustment.↩
7. These construction monies were the amounts that were to be paid by lot owners to Bryce's Mountain once water and sewer systems were installed on each lot.↩
8. We also view the situation in this case as distinguishable from Willow Terrace Development Co. v. Commissioner,40 T.C. 689 (1963), affd. 345 F.2d 933 (5th Cir. 1965). In Willow Terrace,↩ title to the water and sewer systems was placed in trust until such time as the systems could be taken over by a governmental authority. That was sufficient for us to find that the taxpayer had relinquished full ownership and control of the systems. This is in direct contrast to the instant case where petitioners remained the sole owners of the water and sewer systems.
9. We do not think it is significant that the agreement of October 17, 1975 provided that Recreation was to bear all expenses and mortgages on the property beginning October 31, 1975, the last day of Blue Knob's taxable year. We view this as an ineffective effort by Blue Knob to transfer the benefits and burdens of the property.↩