TOM R. AND SUZANNE G. VAN SICKLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Van Sickle v. Commissioner
Docket No. 41077-85.
United States Tax Court
T.C. Memo 1988-115; 1988 Tax Ct. Memo LEXIS 142; 55 T.C.M. (CCH) 407; T.C.M. (RIA) 88115; March 16, 1988; As amended March 16, 1988 *142 Petitioner was a shareholder in a small business corporation that was a partner in a joint venture with a partnership in which petitioner was a general partner. Held: real property held by the joint venture was held for sale to customers in the ordinary course of business; its sale gives rise to ordinary income. Leslie T. Jones, Jr., for the petitioners. Stephen J. Walker, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By notice of deficiency dated October 9, 1985, respondent determined a deficiency in petitioner's [1] 1981 Federal income taxes in the amount of $ 77,729. The sole issue is whether gain on the sale of certain real property is to be taxed as capital gain or ordinary income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioner resided in Scottsdale, Arizona, at the time he filed his petition herein. During 1981, petitioner owned 2,500 of 15,625 outstanding shares in Triad Development Corporation *143 (Triad), [2] *144 a small business corporation under Subchapter S of the Internal Revenue Code. Triad had been in the business of purchasing land for development, subdivision, and resale since its corporation in late 1975 or early 1976. Petitioner was also the managing general partner of Scottsdale Industrial Airpark Associates No. 3 (Associates No. 3)., which was a general partnership formed in March 1978 to take possession of a 110-acre tract near Scottsdale Airport in Scottsdale, Arizona (the Airport tract). The shareholders and partners in these respective enterprises were residents of either Arizona or Kansas, and all were friends of petitioner. [3] All shareholders of Triad were partners in Associates No. 3, and all individual partners in Associates No. 3 were shareholders of Triad. However, their shareholder interests did not correspond to their partnership interests which were as follows: Triad
Associates
Shareholder
Partnership
Name and Address
Interest
Interest
C. N. Cushing
16%
4.50%
Lawrence, Kansas
Paul R. Garegy 16%
4.50%
Downs, Kansas
Daniel C. King
16%
20.07%
Salina, Kansas
G. F. Rhoads
8%
2.25%
Mesa, Arizona
Daniel L. Richardson
8%
17.82%
Salina, Kansas
Scottsdale Industrial
Realty Investments
None
5.58%
Scottsdale, Arizona
Kenneth Stephenson
16%
4.50%
Salina, Kansas
Triad, Inc.
None
2.25%
Scottsdale, Arizona
Tom R. Van Sickle
16%
6.75%
Scottsdale, Arizona
John Wertzberger
4%
31.50%
Lawrence, Kansas
One June 21, 1977, Triad purchased the Airport tract, which contained parcels known as Scottsdale Industrial Airpark Subdivision Nos. 7 and 8 (Parcel Nos. 7 and 8). The purchase price was $ 544,500. This tract was subsequently transferred to Associates No. 3. On March 20, 1978, Triad and Associates No. 3 formed a joint venture named SIAA No. 3, of which Triad was the project manager. SIAA No. 3 was organized to develop and subdivide the Airport tract. The agreement between Triad and Associates No. 3 provided that Associates No. 3 would contribute the use of its interest in the Airport tract to the joint venture. Under the agreement, Triad was to (a) Provide the personnel and all necessary operating and development costs in order to maximize the development potential of the Real Property. All operating expenses such as taxes on the Real Property and appraisal reports shall be considered expenses *145 of the Joint Venture and shall be paid from funds advanced to the Joint Venture by [Triad]. All development costs such as engineering, street improvements, sewer, water and electrical distribution systems shall be considered expenses of the Joint Venture and may be paid from funds advanced to the Joint Venture by [Triad] or, in the alternative, the Real Property may be encumbered by a first lien, which lien for development costs shall not exceed one and one-half (1-1/2) times the fair market value of the Real Property on the date of execution of this Joint Venture Agreement; (b) Secure commitments to furnish interim and permanent financing for the PROJECT; (c) Negotiate and execute a contract or contracts for the construction and development of the PROJECT; (d) Secure all approvals, variances, use permits and re-classifications required under any applicable zoning or land use laws, regulations or ordinances for the construction and development of the PROJECT; and (e) Secure such building permits, inspections, licenses and other permits as may be required under applicable statutes, building codes, ordinances, rules and regulations for the work of the development and construction of *146 the PROJECT. As the property was sold, Associates No. 3 was to receive "the pro rata portion of its basis in the Real Property for the portion of the Real Property disposed of, together with accrued interest at the rate of 7 1/2% compounded semi-annually on such portion of the Real Property sold." Additional cash flow was allocated to Triad until all costs had been reimbursed. The joint venture agreement contained a provision for the distribution of any additional cash flow. On June 16, 1978, a 40-acre portion of the Airport tract was sold for $ 600,000, which was sufficient to service the indebtedness on the remainder of the parcel. This made it unnecessary for Associates No. 3 to make further capital calls upon its partners in order to pay for the land. This sale left SIAA No. 3 with only Parcel Nos. 7 and 8. At the time it was purchased, the Airport tract was zoned for residential use and was not to have more than one home per acre of land. As a result of a zoning change request filed by SIAA No. 3 with the City of Scottsdale, Parcel No. 7 was rezoned from residential to I-1 [4] on October 23, 1979. By June 1981, 10 of 22 lots in Parcel No. 8 were zoned I-1 and the other 12 lots *147 proposed for C-0 and C-4 zoning. [5] However, this rezoning was not final and was subject to several conditions, at least some of which were to be fulfilled within 18 months after the initial zoning change. One of these conditions was that SIAA No. 3 relocate a road across the property, which it did at the behest of and with funds provided by the parcels' eventual purchaser. After the sale of the 40-acre tract, SIAA No. 3 made the following preparations for the sale of Parcel No. 7: 4-11-80
Submitted master plan for streets and drainage.
5-5-80
Filed application for preliminary plat review.
5-20-80
Obtained a list of requirements for approval of
tentative plat from City of Scottsdale.
6-27-80
Received tentative plat approval.
8-5-80
Received preliminary plat approval.
11-17-80
Received recommendation that final plat be approved.
12-15-80
Awarded construction, paving, water, and sewer
contracts.
On January 8, 1981, SIAA No. 3 sold Parcel No. 7 to Thomas H. Treaccar (Treaccar) as managing *148 partner of SIRI, an Arizona partnership. In June 1981, SIAA No. 3 made the following preparations for sale of Parcel No. 8: 6-1-81
Received approval of preliminary plat by flood
control district of Maricopa County.
6-9-91
Received a recommendation of approval of a requested
zoning change.
6-12-81
Received a recommendation of approval of the
preliminary plat by the Maricopa County Health
Department.
6-18-81
Received a recommendation of approval of the
application to subdivide, subject to design
conditions. On September 4, 1981, Parcel No. 8 was also sold to Treaccar. Petitioner reported his distributive share of the gain from both sales as long-term capital gain. The Airport tract was the only piece of real estate ever acquired by Associates No. 3. It was also the only property with which SIAA No. 3 was ever involved. However, Triad was in the business of developing real estate for resale, either alone or with other entities. As petitioner has conceded, the Airport tract was originally purchased for subdivision and sale by SIAA No. 3 in the ordinary course of business. OPINION Section 1202(a)[6] *150 allows a taxpayer a 60-percent deduction for net capital gains. [7] Net capital gains are determined *149 by reference to whether an asset is a capital asset. Sec. 1222(11). A capital asset is defined in section 1221 as property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
This statutory provision is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand ( Corn Products Co. v. Commissioner,350 U.S. 46, 52) and 'the realization of appreciation in value accrued over a substantial period of time' on the other ( Commissioner v. Gillette Motor Co.,364 U.S. 130, 134 * * *). [Malat v. Riddell,383 U.S. 569, 571 (1966).]
However, the burden of proof is on petitioner, Rule 142(a); Welch v. Helvering,290 U.S. 111 (1930); and as capital gain provisions are an exception to the normal tax rates, they are to be narrowly construed. Corn Products Co. v. Commissioner,350 U.S. 46, 52 (1955). See Arkansas Best Corp. v. Commissioner    U.S.    , 56 U.S.L.W. 4299, 4231 (March 7, 1988).
The question of whether property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business is necessarily one of intent. Petitioner concedes that the Airport tract was purchased for development, subdivision, and sale, but contends that SIAA No. 3's purpose changed after the sale of the 40-acre Parcel. It is this entity whose intent we must determine in order to properly characterize the nature of the gain from the sale of Parcel Nos. 7 and 8. [8]
The fact that each case involving this issue must be considered on its individual facts accounts at least in part *151 for the multitude of cases in this area. See Bynum v. Commissioner,46 T.C. 295, 299 (1966). Petitioner has conceded a purpose at the time of purchase which, if present at the time of sale, would give rise to ordinary income. However, the fact that petitioner acquired the [Airport tract] for the purpose of development and sale to customers in the ordinary course of its business does not, ipso facto, prevent petitioner from prevailing on this issue. To do so, however, petitioner must prove sufficient facts to satisfy us that at the time of sale its purpose for holding the property had changed to an investment purpose. [Citations omitted. Herzog Building Corp. v. Commissioner,44 T.C. 694, 704 (1965).]
While the original intent is a factor to be considered, the intent at the time of sale is determinative. Redwood Empire Savings and Loan Association v. Commissioner,628 F.2d 516, 518 (9th Cir. 1980), affg. 68 T.C. 960 (1977); Eline Realty Co. v. Commissioner,35 T.C. 1, 5 (1960). In determining a taxpayer's intent, and therefore the character of gain, we have looked at a number of factors which include: The nature and purpose of the acquisition of the property and the duration *152 of the ownership; the extent and nature of the taxpayer's efforts to sell the property; the number, extent, continuity, and substantiality of the sales; the extent of subdividing, developing, and advertising to increase sales; the use of a business office for the sale of the property; the character and degree of supervision or control exercised by the taxpayer over the representative selling the property; and the time and effort the taxpayer habitually devoted to the sale. [Citations omitted. Buono v. Commissioner,74 T.C. 187, 199 (1980).]
Here, the presence or absence of some of these factors is consistent with both holding for investment purpose and holding in the ordinary course of business. SIAA No. 3 admittedly purchased the land with the intent to develop and sell it, but held Parcel No. 7 for 3-1/2 years and Parcel No. 8 for more than 4 years before sale. SIAA No. 3 never overtly advertised Parcel Nos. 7 and 8, but used an in-house real estate agent in the same manner as did Triad in its sale of fully developed subdivision lots. Further, the property was never actually subdivided, although plans for improvements consistent with subdivision were submitted and in some cases *153 approved. SIAA No. 3 awarded contracts for drainage, streets, and sewers for Parcel No. 7 and had obtained a recommendation that its application to subdivide Parcel No. 8 be approved. Petitioner points to the sale of 40 acres of the Airport tract for over $ 600,000 as the moment when SIAA No. 3's purpose for holding the land changed from being held for sale to customers in the ordinary course of business to being held for investment purposes. Petitioner argues that when SIAA No. 3 had sufficient funds to service the debt on the remaining portion of the land, there was no longer a need to ask the partners (of Associates No. 3) for additional contributions. Petitioner contends that the partners were required to personally guarantee any debts of the partnership, which at that time had a large amount of debt outstanding; a desire to avoid additional debt was the primary motive behind foregoing any further development. Petitioner's argument leaves us unpersuaded. SIAA No. 3 sold the 40-acre tract on June 18, 1978, after which Parcel Nos. 7 and 8 were supposedly held for investment only. However, SIAA No. 3 was still engaged in activities consistent with its original intent as regards *154 those parcels through 1980 and into 1981. While these activities may have been undertaken to protect the zoning acquired by SIAA No. 3, the fact remains that such activities facilitated the eventual sale of Parcel Nos. 7 and 8. Those activities are inconsistent with a pure investment motive. Petitioner has merely presented a rationale for his theory, he has not proven sufficient facts to satisfy us that Parcel Nos. 7 and 8 were held for investment at the time of their sale. See Herzog Building Corp. v. Commissioner, supra.
Petitioner's argument also fails in another respect. Petitioner relies solely upon his own testimony to support his argument that the sale of the 40-acre tract was the point at which SIAA No. 3's purpose for holding the property changed to one of investment. Petitioner did not produce any of his fellow investors to corroborate his testimony. At least one of those investors resided in Arizona and would have presumably been available to provide such testimony. Similarly, petitioner produced no correspondence from any of his fellow investors, whether in Arizona or Kansas, tending to show that the remainder of the Airport tract was ever held for anything but *155 for the sale to customers in the ordinary course of business. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Petitioner has therefore failed to carry the burden of proof imposed upon himself by Rule 142(a). In consideration of the foregoing, Decision will be entered for the respondent.
Footnotes
1. Since the sole issue in this case arises from Tom R. Van Sickle's activities, all further references to petitioner are to him. ↩
2. For most of its life, Triad operated under the name of Scottsdale Industrial Airpark, Inc. By amendment to its articles of incorporation dated June 4, 1981, Triad acquired its present name. To avoid confusion, we will refer only to Triad in this opinion. 3. Petitioner is a former resident of Kansas. ↩
4. See n. 5, infra.↩
5. While the record contains no reference to zoning designations, we assume that "I" stands for industrial and "C" stands for commercial. Neither does the record reflect the size of the lots in each parcel.↩
6. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. 7. Section 1202↩ was repealed by section 301(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2752. 8. Section 761(a) defines a partnership to include a joint venture. Section 702(b) provides that the character of a partner's distributive share is to be determined "as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership." See Podell v. Commissioner,55 T.C. 429, 433↩ (1970).